McGEE, Chief Judge.
*265 Jamison Christopher Goins ("Defendant") was indicted on 8 September 2014 for possession of a firearm by a felon, possession with intent to sell or deliver marijuana, felony possession of marijuana, and possession of drug paraphernalia. The charges against Defendant resulted from evidence obtained following a stop of Defendant's vehicle, a Hyundai Elantra ("the Elantra"), just after midnight on the morning of 14 July 2014. Officer A.T. Branson ("Officer Branson") and Officer T.B. Cole ("Officer Cole") (together, "the officers"), of the Greensboro Police Department, were patrolling in the vicinity of the Spring Manor Apartment Complex ("the apartment complex") late on 13 July 2014 and *266 into 14 July 2014. At some time prior to 14 July 2014, Officer Branson was talking to the manager of the apartment complex concerning an unrelated matter when the manager stated to him: " 'The apartment complex is getting bad again,' ... and she also mentioned that she received word from residents in the apartment complex that the occupants of Apartment 408 were involved in both the sale and use of illegal narcotics." " Apartment 408" was actually a building comprised of multiple apartments. Both officers testified the apartment complex was situated in a high-crime drug area, and Officer Cole referred to the apartment complex as "basically an open-air drug market."
Just after midnight on 14 July 2014, the officers were driving a marked police car ("the police car") and decided to drive through the parking lot of Spring Valley Shopping Center ("the shopping center"), which was directly across the street from the apartment complex. Officer Branson was driving the police car, and he turned the police car so that its headlights were focused in the direction of the apartment complex.
*468 At the suppression hearing, Officer Cole testified:
Not long after I began looking, we noticed a white Hyundai Elantra pull into the [apartment] complex and proceed very slowly through.
I observed no one out in the parking lot, no other vehicles running. As I made-as I watched the Elantra and it came around the u-shaped driveway, I noticed an individual [ ("the man") ] standing outside building 408. I advised Officer Branson to pay attention to [the man] and the [Elantra].
As [the Elantra] came around the corner and became-or drove closer to [the man] and that building, 408, I noticed [the man] turn and look towards our police car, because our headlights at that point had basically turned to the point that we were lighting his direction.
He looked at us, looked back at the Elantra, looked at us again, and then shouted something at the passenger side, whatever-that was the side facing him-toward the Elantra. At that point [the man] began to back away and head back into the apartment complex.
The [Elantra] sped up and pulled out of the parking lot. I told Officer Branson to stick with the [Elantra], because you can't get both. After that we decided, based on the *267 totality of the circumstances and the reasonable suspicion that we had at that time, that we would go ahead and conduct a traffic stop on the [Elantra].[1]
Officer Branson testified he observed the Elantra driving slowly around the "U-shaped" drive of the apartment complex parking lot; observed the man standing outside building 408, illuminated by the headlights of the police car; observed the man "look in [the] direction [of the police car] and look back at the ... Elantra, which was [by then] almost in front of [the man;]" was informed by Officer Cole that Officer Cole had "heard someone yell[;]" then observed the Elantra increase its speed and "quickly" exit the apartment complex parking lot; and observed the man turn around and enter apartment building 408. The officers then initiated the stop of the Elantra based upon a belief that there was reasonable suspicion that the occupants of the Elantra and the man were about to conduct an illegal drug transaction.[2] As a result of this stop, the officers discovered that Defendant was in possession of a firearm, marijuana, and drug paraphernalia.
Defendant moved to suppress all evidence obtained as a result of the stop based upon his argument that there was not reasonable suspicion sufficient to justify the stop. Defendant's motion was heard on 13 April 2015, and was denied by order entered 15 April 2015. Defendant preserved his right to appeal the denial of his motion to suppress, and entered guilty pleas for the charges of possession of a firearm by a felon, possession with intent to sell or distribute marijuana, and possession of drug paraphernalia. The charge of possession of marijuana was dismissed pursuant to the plea agreement. Defendant was sentenced to a cumulative eighteen to forty months, the sentences were suspended, and Defendant was placed on supervised probation. Defendant appeals.
Defendant argues that the trial court erred in denying his motion to suppress all evidence obtained pursuant to the stop of the Elantra on 14 July 2014. We agree.
*268 Defendant specifically argues the following: (1) the record evidence did not support the trial court's finding that Defendant's actions constituted "flight," (2) that the trial court erred in that there was insufficient *469 evidence of any nexus between the police presence and Defendant's action in exiting the parking lot of the apartment complex-and that there was no evidence, nor finding, that Defendant noticed the officers across the street, and (3) there was insufficient evidence supporting reasonable suspicion that criminal activity was afoot.
Our standard of review is as follows:
"[T]he scope of appellate review of [a denial of a motion to suppress] is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." A trial court's factual findings are binding on appeal "if there is evidence to support them, even though the evidence might sustain findings to the contrary." We review the trial court's conclusions of law de novo.
State v. Mello, 200 N.C.App. 437, 439, 684 S.E.2d 483, 486 (2009) (citations omitted).
Our Supreme Court has discussed the obligations and prerequisites for making a vehicle stop consistent with the Fourth Amendment:
The Fourth Amendment protects individuals "against unreasonable searches and seizures." The North Carolina Constitution provides similar protection. A traffic stop is a seizure "even though the purpose of the stop is limited and the resulting detention quite brief." Such stops have "been historically viewed under the investigatory detention framework first articulated in Terry v. Ohio [.]" Despite some initial confusion following the United States Supreme Court's decision in Whren v. United States, ... courts have continued to hold that a traffic stop is constitutional if the officer has a "reasonable, articulable suspicion that criminal activity is afoot."
Reasonable suspicion is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Only " 'some minimal level of objective justification' " is required. This *269 Court has determined that the reasonable suspicion standard requires that "[t]he stop ... be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training." Moreover, "[a] court must consider 'the totality of the circumstances-the whole picture' in determining whether a reasonable suspicion" exists.
State v. Barnard, 362 N.C. 244, 246-47, 658 S.E.2d 643, 645 (2008) (citations omitted). "[T]he 'constitutionality of a traffic stop depends on the objective facts, not the officer's subjective motivation [.]' " State v. Heien, 366 N.C. 271, 276, 737 S.E.2d 351, 354 (2012) (citations omitted). The trial court's determination of whether the totality of the circumstances supports a reasonable suspicion that the defendant might be engaged in criminal activity is a conclusion of law subject to de novo review. State v. Wilson, 155 N.C.App. 89, 93-94, 574 S.E.2d 93, 97 (2002). Furthermore, the trial court's conclusions of law based on the totality of circumstances " 'must be legally correct, reflecting a correct application of applicable legal principles to the facts found.' " State v. Barden, 356 N.C. 316, 332, 572 S.E.2d 108, 121 (2002) (citations omitted).
In order to evaluate the trial court's conclusion that the stop in the present case was justified, we begin with the United States Supreme Court opinion Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), which recognized that "flight" from police presence can be a factor in support of finding reasonable suspicion:
On September 9, 1995, Officers Nolan and Harvey were working as uniformed officers in the special operations section of the Chicago Police Department. The officers were driving the last car of a four-car caravan converging on an area known for heavy narcotics trafficking in order to investigate drug transactions. The officers were traveling together because they expected to find a crowd of people in the area, including lookouts and customers.
As the caravan passed 4035 West Van Buren, Officer Nolan observed respondent Wardlow standing next to the building *470 holding an opaque bag. Respondent looked in the direction of the officers and fled. Nolan and Harvey turned their car southbound, watched him as he ran through the gangway and an alley, and eventually cornered him on the street.
Id. at 121-22, 120 S.Ct. at 674-75, 145 L.Ed.2d at 574-75.
*270 It was in this context that Officer Nolan decided to investigate Wardlow after observing him flee. An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a Terry analysis.
In this case, moreover, it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. We conclude Officer Nolan was justified in suspecting that Wardlow was involved in criminal activity, and, therefore, in investigating further.
Such a holding is entirely consistent with our decision in Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), where we held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. And any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with *271 the individual's right to go about his business or to stay put and remain silent in the face of police questioning.
Id. at 124-25, 120 S.Ct. at 676, 145 L.Ed.2d at 576-77 (citations omitted). In Wardlow, the uniformed officers involved were part of a four-car caravan entering an area of "heavy narcotics trafficking" for the purpose of policing illegal drug activity. The officers anticipated there would be large numbers of people in the area and expected "lookouts" to be present, ready to alert those persons of police presence. The officers observed the defendant standing near a building holding an opaque bag in his hands. When the defendant noticed the officers, he fled on foot. The United States Supreme Court discussed this behavior by the defendant as follows: "Headlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. at 124, 120 S.Ct. at 676, 145 L.Ed.2d at 576. The Wardlow Court then clarified how this behavior was different than that in earlier opinions, in which it had made clear that, absent reasonable suspicion to detain a person, "[t]he person approached ... need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." Florida v. Royer, 460 U.S. 491, 497-98, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983) (citation omitted). Refusing to stop for the police and "going about one's business" cannot, absent more, justify detention. However:
Flight, by its very nature, is not "going about one's business"; in fact, it is just the *471 opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.
Wardlow, 528 U.S. at 125, 120 S.Ct. at 676, 145 L.Ed.2d at 577.
In the present matter, the trial court heard the testimonies of the officers. Officer Branson testified that he based his reasonable suspicion on the following:
Time of night, prior info given by the manager about Apartment 408, and knowing that the complex is a high drug crime area, as well as the business in that intersection, suspicious travel, nobody entering or exiting the [Elantra] as it traveled through the apartment complex, being alerted, that an individual called out as the [Elantra] was traveling through and once that call was made by the individual the [Elantra] exited more rapidly than it began-or than it was traveling, and then the quick exit upon that.
*272 Officer Cole testified as follows:
Not long after I began looking, we noticed a white Hyundai Elantra pull into the complex and proceed very slowly through. I observed no one out in the parking lot, no other vehicles running. As I made-as I watched the Elantra and it came around the u-shaped driveway, I noticed an individual standing outside building 408. I advised Officer Branson to pay attention to that subject and the [Elantra]. As it came around the corner and became-or drove closer to that subject and that building, 408, I noticed the subject turn and look towards our police car, because our headlights at that point had basically turned to the point that we were lighting his direction. He looked at us, looked back at the Elantra, looked at us again, and then shouted something at the passenger side, whatever-that was the side facing him-toward the Elantra. At that point he began to back away and head back into the apartment complex. The [Elantra] sped up and pulled out of the parking lot. I told Officer Branson to stick with the [Elantra], because you can't get both. After that we decided, based on the totality of the circumstances and the reasonable suspicion that we had at that time, that we would go ahead and conduct a traffic stop on the [Elantra].
As in Wardlow, the officers in the present case testified that Defendant was in an area of high crime and drug activity. However, the testimony in Wardlow suggested a much more active drug scene than the testimony in the present case. Officer Branson testified that the manager of the apartment complex had informed him:
"The apartment is getting bad again," referring-I'm assuming that she was referring to general activity, but she made specific mention to building 408 and that she believes the individuals, through what other residents have told her, that they are involved in the use and sale of illegal narcotics.
In Wardlow, the defendant was seen holding an opaque bag, which officers believed might contain illegal drugs. In the present case, although Defendant was seen driving in the direction of the apartment building that officers had been told might be the site of drug transactions, officers did not observe Defendant, nor the man, in possession of a container typical of the type used to carry illegal drugs.
*273 Defendant's mere presence in an area known for criminal narcotics activity could not, standing alone, have provided the reasonable suspicion necessary for the officers to initiate the stop of the Elantra. As in Wardlow, the outcome in the present case is determined by the presence or absence of additional circumstances sufficient to rise to the level of reasonable suspicion. In Wardlow, the defendant fled on foot after observing uniformed police officers approaching, and the causal link between the approach of the police and the "unprovoked flight" of the defendant was easily drawn. In the present case, that link is not as readily ascertainable. Officers Branson and Cole both testified they could not see Defendant in his vehicle; they could not observe Defendant's behavior or actions, other than by observing the Elantra itself.
*472 Q. At the point that you were looking at ... my client driving around the parking lot there. Did you see him with any guns or drugs?
A. No, sir. I was across the street.
Q. Okay. Did you see him with any paraphernalia?
A. No, sir.
Q. Okay. Did you see him with any money?
A. This is why I conducted the investigative stop.
Q. Did you see him try to destroy anything?
A. No, sir.
Q. Did you see him try to conceal anything?
A. No, sir. But this all stems back to I can't see inside of a vehicle from across West Meadowview Road.
Further, there was no evidence to indicate Defendant personally observed the police car across the street before he left the parking lot of the apartment complex.
Evidence of flight is much clearer in situations such as those in Wardlow, where a defendant's actions consisted of running away from police on foot, than is the evidence in the present matter. Officer Branson testified that Defendant's driving "raised [his] suspicion to fleeing upon police presence, although there wasn't like a running flight or extreme changing from driving slowly through the [apartment] complex to speeding up as our police vehicle was observed." (Emphasis added). Defendant did not break any traffic laws in his exit from the apartment *274 complex; the stop of the Elantra was based solely on the officers' suspicion that Defendant had been driving through the apartment complex in order to make a drug-related transaction. As this Court has stated in Mello,
merely leaving a drug-ridden area in a normal manner is not sufficient to justify an investigatory detention. See In re J.L.B.M., 176 N.C.App. 613, 619-22, 627 S.E.2d 239, 243-45 (2006) (holding that information that a suspicious person wearing baggy clothes had been seen in a drug-ridden area and that he walked away upon the approach of law enforcement officers did not suffice to support an investigatory detention); State v. Roberts, 142 N.C.App. 424, 430, n. 2, 542 S.E.2d 703, 708, n. 2 (2001) (stating that "evidence that Defendant walked away from [a police officer] after he asked Defendant to stop is not evidence that Defendant was attempting to flee from [the police officer] and, thus, indicates nothing more than Defendant's refusal to cooperate"); State v. Rhyne, 124 N.C.App. 84, 89-91, 478 S.E.2d 789, 791-93 (1996) (holding that an officer lacked reasonable suspicion to frisk a defendant who was sitting in an area known to be a center of drug activity without taking evasive action or otherwise engaging in suspicious conduct); State v. Fleming, 106 N.C.App. 165, 170-71, 415 S.E.2d 782, 785 (1992) (holding that the fact that defendant was standing in an open area between two apartment buildings and walked away upon the approach of law enforcement officers did not justify an investigatory detention).
Mello, 200 N.C.App. at 449-50, 684 S.E.2d at 492.
In Mello, this Court held that the challenged stop was proper based upon the following facts:
At approximately 10:30 a.m. on 26 August 2006, Officer Pritchard was patrolling the area of Chandler and Amanda Place when he observed a vehicle driven by Defendant stop about fifteen to twenty yards away. At that time, Officer Pritchard watched "two other individuals approach the vehicle putting their hands into the vehicle;" however, he did not see any exchange or transfer of money. Officer Pritchard had not previously seen Defendant, but he recognized the two men standing outside the vehicle. He did not, however, know their names or whether he had previously arrested *275 them. Officer Pritchard characterized the area of Chandler and Amanda Place as "a very well-known drug location" where he had previously made drug-related arrests.
Based on his observation of the interaction between Defendant and the two individuals *473 who approached his vehicle, Officer Pritchard suspected that he had witnessed a "drug transaction," something he had seen on numerous prior occasions. After seeing the episode at Defendant's automobile, Officer Pritchard drove a short distance before turning around. At that point, the two individuals fled the area, with one of them quickly entering a house. In addition, Defendant started driving away from the area in the opposite direction from that in which Officer Pritchard was traveling. According to Officer Pritchard, Defendant did not commit any traffic offense as he attempted to drive away. Officer Pritchard turned around again and stopped Defendant's vehicle.
Id. at 438, 684 S.E.2d at 485. The Mello Court reasoned:
The fact that the two pedestrians fled in the immediate aftermath of an interaction with Defendant that could be reasonably construed as a hand-to-hand drug transaction which took place in "a well[-]known drug location with high drug activity" would clearly have raised a reasonable suspicion in the mind of a competent and experienced law enforcement officer that further investigation was warranted; the fact that Defendant did not drive away at a high rate of speed or take some other obvious evasive action himself does not change that fact. The federal and state constitutions do not, under existing decisional authority, require more in order for a valid investigatory detention to take place.
Id. at 450-51, 684 S.E.2d at 492-93. These factors are similar to those relied upon in Wardlow -except that the flight from the police was by the defendant in Wardlow, whereas in Mello the flight was by the individuals who were conducting the suspicious activity with the defendant.
By contrast, in the present case, the officers suspected that Defendant might be approaching the man outside building 408 to conduct a drug transaction, but unlike in Mello, Defendant and the man were not observed conducting any suspicious activity together. The man standing *276 outside building 408 did not approach the Elantra and did not reach his hand inside the Elantra. Although Officer Cole testified he suspected the man saw the police car and then yelled a warning to Defendant, the man and Defendant were never in close contact with each other. As with the defendant in Mello, Defendant in the present case drove away from the scene in a lawful manner. However, unlike in Mello, the man standing near the Elantra did not flee upon seeing the police-he simply turned around and walked into the apartment building. The manner in which Defendant left the parking lot of the apartment complex cannot be reasonably described as "headlong flight." In Wardlow, Mello, and other cases in which "flight" has been used to render legal a stop that would have otherwise been illegal, the officers readily observed actual flight, and based their reasonable suspicion of criminal activity upon a totality of circumstances which included actual observed flight.
The dissenting opinion objects to our distinction between "actual flight" and "suspected flight." We simply make a distinction between evidence sufficient to support a finding that a defendant was attempting to evade police contact and evidence that can only support a suspicion or conjecture that a defendant was attempting to evade police contact. Suspicion or conjecture that a defendant might have been attempting to flee police presence, absent additional suspicious circumstances, is insufficient to support reasonable suspicion that someone leaving a known drug area was engaged in criminal activity. See, e.g., In re J.L.B.M., 176 N.C.App. 613, 621-22, 627 S.E.2d 239, 245 (2006) ; State v. Fleming, 106 N.C.App. 165, 170-71, 415 S.E.2d 782, 785 (1992). In each of the cases cited in the dissenting opinion there were additional elements involved, which served to raise what could have been categorized as a mere suspicion of alleged flight to a reasonable inference that flight had actually occurred. State v. Jackson, 368 N.C. 75, 80, 772 S.E.2d 847, 850 (2015) (emphasis added) ("In making this determination, we are mindful of the dangers identified by defendant in his brief and at oral argument of making the simple act of walking in one's own neighborhood a possible indication of criminal activity. Here, defendant was *474 walking in, and "the stop occurred in[,] a 'high crime area' [which is] among the relevant contextual considerations in a Terry analysis." However, we do not hold that those circumstances, standing alone, suffice to establish the existence of reasonable suspicion. Here, in contrast, the trial court based its conclusion on more than defendant's presence in a high crime and high drug area. The findings of fact show defendant stood at 9:00 p.m. in a specific location known for hand-to-hand drug transactions that had been the site of many narcotics investigations; defendant and Benton split up and walked in opposite directions *277 upon seeing a marked police vehicle approach; they came back very near to the same location once the patrol car passed; and they walked apart a second time upon seeing Officer Brown's return.[3] WE CONCLUDE THAT THESE facts go beyond an inchoate suspicion or hunch [.]"); State v. Butler, 331 N.C. 227, 233, 415 S.E.2d 719, 722 (1992) (emphasis added) ("1) defendant was seen in the midst of a group of people congregated on a corner known as a 'drug hole'; 2) Hedges had had the corner under daily surveillance for several months; 3) Hedges knew this corner to be a center of drug activity because he had made four to six drug-related arrests there in the past six months; 4) Hedges was aware of other arrests there as well; 5) defendant was a stranger to the officers [who had been surveilling this corner for months]; 6) upon making eye contact with the uniformed officers, defendant immediately moved away,[4] behavior that is evidence of flight[.]"); State v. Willis, 125 N.C.App. 537, 542, 481 S.E.2d 407, 411 (1997) (emphasis added) ("Defendant left a suspected drug house just before the search warrant was executed. Defendant set out on foot and took evasive action when he knew he was being followed. And, at the suppression hearing, Detective Sholar testified that defendant had exhibited nervous behavior. "). Each of these cases presents additional indicia of potential criminal activity and flight absent from the case presently before us.
Further, there must be some nexus between a suspect's "flight" and the presence of the police, and that "flight" must reasonably demonstrate "evasive action." State v. White, 214 N.C.App. 471, 479-80, 712 S.E.2d 921, 928 (2011) ; see also J.L.B.M., 176 N.C.App. at 622, 627 S.E.2d at 245 (holding there was no reasonable suspicion where an officer "relied solely on the dispatch that there was a suspicious person at the Exxon gas station, that the juvenile matched the 'Hispanic male' description of the suspicious person, that the juvenile was wearing baggy clothes, and that the juvenile chose to walk away from the patrol car"); Fleming, 106 N.C.App. at 170-71, 415 S.E.2d at 785 ("In the case now before us, at the time Officer Williams first observed defendant and his companion, they *278 were merely standing in an open area between two apartment buildings. At this point, they were just watching the group of officers standing on the street and talking. The officer observed no overt act by defendant at this time nor any contact between defendant and his companion. Next, the officer observed the two men walk between two buildings, out of the open area, toward Rugby Street and then begin walking down the public sidewalk in front of the apartments. These actions were not sufficient to create a reasonable suspicion that defendant was involved in criminal conduct, it being neither unusual nor suspicious that they chose to walk in a direction which led away from the group of officers."); cf., State v. Jackson, 368 N.C. 75, 80, 772 S.E.2d 847, 850-51 (2015) (citation omitted) (Supreme Court reversed this Court's determination that no reasonable suspicion existed because "the trial court based its conclusion on more than defendant's presence in a high crime and high drug area. The findings of fact *475 show defendant stood at 9:00 p.m. in a specific location known for hand-to-hand drug transactions that had been the site of many narcotics investigations; defendant and Benton split up and walked in opposite directions upon seeing a marked police vehicle approach; they came back very near to the same location once the patrol car passed; and they walked apart a second time upon seeing Officer Brown's return. We conclude that these facts go beyond an inchoate suspicion or hunch and provide a 'particularized and objective basis for suspecting [defendant] of [involvement in] criminal activity.' ").
In the present case, the officers observed activity which made them suspect that Defendant's actions in leaving the apartment complex might constitute flight, and then this suspicion of flight was used in turn to support the suspicion that criminal activity was afoot. We hold that the record evidence does not support the trial court's finding that Defendant "fled" from the officers. We further hold, on these facts, that the suspicion of flight from an area of known illegal narcotics activity, in the form of accelerating the Elantra in a lawful manner and driving away from the apartment complex, without more, did not justify the stop of the Elantra and the detention of Defendant. Contrary to the assertion in the dissenting opinion, our holding is not based solely upon the insufficiency of the evidence to support the trial court's finding of "flight," but upon the totality of the circumstances in this case. The circumstances in the present case do not include the kind of additional suspicious activity required to form a reasonable suspicion-unlike the circumstances present in Wardlow, Jackson, Butler, Willis, and similar opinions. We reverse the trial court's denial of Defendant's motion to suppress and remand to the trial court for further action consistent with this opinion.
REVERSED AND REMANDED.
Judge INMAN concurs.
Judge TYSON dissents with separate opinion.

The dissenting opinion cites additional testimony by Officer Cole that the man standing in front of building 408 "warned [Defendant] that we were across the street, and they drove out and left[,]" and that the man "yelled something to them, which caused them to speed up and leave the complex[.]" It is clear from all the testimony that Officer Cole suspected or believed that the man may have warned Defendant of police presence. There is not record evidence to support any definitive statement that the man warned Defendant of police presence, or that Defendant understood any "yell" from the man to be a warning of police presence.

The officers could not see inside the Elantra, so they did not know how many occupants it contained, nor could they observe any actions of Defendant, who was in fact the sole occupant.

In Jackson, the defendant and his companion twice split up and walked away from a known high drug transaction location upon seeing the police car approaching. The evidence that the defendant in Jackson was engaging in evasive behavior was much stronger than the evidence presently before us.

In Butler, there was direct evidence of cause and effect between the defendant noticing the officers and his immediate decision to move away from the officers. Further, there was additional non-flight evidence supporting a finding of reasonable suspicion. In the present case, there is only conjecture that Defendant might have seen the police car across the street.