IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA15-1183

 Filed: 5 July 2016

Guilford County, No. 14 CRS 81446-47

STATE OF NORTH CAROLINA

 v.

JAMISON CHRISTOPHER GOINS

 Appeal by Defendant from judgment entered 29 May 2015 by Judge Richard

S. Gottleib in Superior Court, Guilford County. Heard in the Court of Appeals 31

March 2016.

 Attorney General Roy Cooper, by Assistant Attorney General Shawn R. Evans,
 for the State.

 Willis Johnson & Nelson PLLC, by Drew Nelson, for Defendant.

 McGEE, Chief Judge.

 Jamison Christopher Goins (“Defendant”) was indicted on 8 September 2014

for possession of a firearm by a felon, possession with intent to sell or deliver

marijuana, felony possession of marijuana, and possession of drug paraphernalia.

The charges against Defendant resulted from evidence obtained following a stop of

Defendant’s vehicle, a Hyundai Elantra (“the Elantra”), just after midnight on the

morning of 14 July 2014. Officer A.T. Branson (“Officer Branson”) and Officer T.B.

Cole (“Officer Cole”) (together, “the officers”), of the Greensboro Police Department,
 STATE V. GOINS

 Opinion of the Court

were patrolling in the vicinity of the Spring Manor Apartment Complex (“the

apartment complex”) late on 13 July 2014 and into 14 July 2014. At some time prior

to 14 July 2014, Officer Branson was talking to the manager of the apartment

complex concerning an unrelated matter when the manager stated to him: “‘The

apartment complex is getting bad again,’ . . . and she also mentioned that she received

word from residents in the apartment complex that the occupants of Apartment 408

were involved in both the sale and use of illegal narcotics.” “Apartment 408” was

actually a building comprised of multiple apartments. Both officers testified the

apartment complex was situated in a high-crime drug area, and Officer Cole referred

to the apartment complex as “basically an open-air drug market.”

 Just after midnight on 14 July 2014, the officers were driving a marked police

car (“the police car”) and decided to drive through the parking lot of Spring Valley

Shopping Center (“the shopping center”), which was directly across the street from

the apartment complex. Officer Branson was driving the police car, and he turned

the police car so that its headlights were focused in the direction of the apartment

complex. At the suppression hearing, Officer Cole testified:

 Not long after I began looking, we noticed a white Hyundai
 Elantra pull into the [apartment] complex and proceed
 very slowly through.

 I observed no one out in the parking lot, no other vehicles
 running. As I made – as I watched the Elantra and it came
 around the u-shaped driveway, I noticed an individual
 [(“the man”)] standing outside building 408. I advised

 -2-
 STATE V. GOINS

 Opinion of the Court

 Officer Branson to pay attention to [the man] and the
 [Elantra].

 As [the Elantra] came around the corner and became – or
 drove closer to [the man] and that building, 408, I noticed
 [the man] turn and look towards our police car, because our
 headlights at that point had basically turned to the point
 that we were lighting his direction.

 He looked at us, looked back at the Elantra, looked at us
 again, and then shouted something at the passenger side,
 whatever – that was the side facing him – toward the
 Elantra. At that point [the man] began to back away and
 head back into the apartment complex.

 The [Elantra] sped up and pulled out of the parking lot. I
 told Officer Branson to stick with the [Elantra], because
 you can’t get both. After that we decided, based on the
 totality of the circumstances and the reasonable suspicion
 that we had at that time, that we would go ahead and
 conduct a traffic stop on the [Elantra].1

 Officer Branson testified he observed the Elantra driving slowly around the

“U-shaped” drive of the apartment complex parking lot; observed the man standing

outside building 408, illuminated by the headlights of the police car; observed the

man “look in [the] direction [of the police car] and look back at the . . . Elantra, which

was [by then] almost in front of [the man;]” was informed by Officer Cole that Officer

 1 The dissenting opinion cites additional testimony by Officer Cole that the man standing in
front of building 408 “warned [Defendant] that we were across the street, and they drove out and
left[,]” and that the man “yelled something to them, which caused them to speed up and leave the
complex[.]” It is clear from all the testimony that Officer Cole suspected or believed that the man may
have warned Defendant of police presence. There is not record evidence to support any definitive
statement that the man warned Defendant of police presence, or that Defendant understood any “yell”
from the man to be a warning of police presence.

 -3-
 STATE V. GOINS

 Opinion of the Court

Cole had “heard someone yell[;]” then observed the Elantra increase its speed and

“quickly” exit the apartment complex parking lot; and observed the man turn around

and enter apartment building 408. The officers then initiated the stop of the Elantra

based upon a belief that there was reasonable suspicion that the occupants of the

Elantra and the man were about to conduct an illegal drug transaction.2 As a result

of this stop, the officers discovered that Defendant was in possession of a firearm,

marijuana, and drug paraphernalia.

 Defendant moved to suppress all evidence obtained as a result of the stop based

upon his argument that there was not reasonable suspicion sufficient to justify the

stop. Defendant’s motion was heard on 13 April 2015, and was denied by order

entered 15 April 2015. Defendant preserved his right to appeal the denial of his

motion to suppress, and entered guilty pleas for the charges of possession of a firearm

by a felon, possession with intent to sell or distribute marijuana, and possession of

drug paraphernalia. The charge of possession of marijuana was dismissed pursuant

to the plea agreement. Defendant was sentenced to a cumulative eighteen to forty

months, the sentences were suspended, and Defendant was placed on supervised

probation. Defendant appeals.

 Defendant argues that the trial court erred in denying his motion to suppress

all evidence obtained pursuant to the stop of the Elantra on 14 July 2014. We agree.

 2 The officers could not see inside the Elantra, so they did not know how many occupants it
contained, nor could they observe any actions of Defendant, who was in fact the sole occupant.

 -4-
 STATE V. GOINS

 Opinion of the Court

 Defendant specifically argues the following: (1) the record evidence did not

support the trial court’s finding that Defendant’s actions constituted “flight,” (2) that

the trial court erred in that there was insufficient evidence of any nexus between the

police presence and Defendant’s action in exiting the parking lot of the apartment

complex – and that there was no evidence, nor finding, that Defendant noticed the

officers across the street, and (3) there was insufficient evidence supporting

reasonable suspicion that criminal activity was afoot.

 Our standard of review is as follows:

 “[T]he scope of appellate review of [a denial of a motion to
 suppress] is strictly limited to determining whether the
 trial judge’s underlying findings of fact are supported by
 competent evidence, in which event they are conclusively
 binding on appeal, and whether those factual findings in
 turn support the judge’s ultimate conclusions of law.” A
 trial court’s factual findings are binding on appeal “if there
 is evidence to support them, even though the evidence
 might sustain findings to the contrary.” We review the
 trial court’s conclusions of law de novo.

State v. Mello, 200 N.C. App. 437, 439, 684 S.E.2d 483, 486 (2009) (citations omitted).

 Our Supreme Court has discussed the obligations and prerequisites for making

a vehicle stop consistent with the Fourth Amendment:

 The Fourth Amendment protects individuals “against
 unreasonable searches and seizures.” The North Carolina
 Constitution provides similar protection. A traffic stop is a
 seizure “even though the purpose of the stop is limited and
 the resulting detention quite brief.” Such stops have “been
 historically viewed under the investigatory detention
 framework first articulated in Terry v. Ohio[.]” Despite

 -5-
 STATE V. GOINS

 Opinion of the Court

 some initial confusion following the United States Supreme
 Court’s decision in Whren v. United States, . . . courts have
 continued to hold that a traffic stop is constitutional if the
 officer has a “reasonable, articulable suspicion that
 criminal activity is afoot.”

 Reasonable suspicion is a “less demanding standard than
 probable cause and requires a showing considerably less
 than preponderance of the evidence.” Only “‘some minimal
 level of objective justification’” is required. This Court has
 determined that the reasonable suspicion standard
 requires that “[t]he stop . . . be based on specific and
 articulable facts, as well as the rational inferences from
 those facts, as viewed through the eyes of a reasonable,
 cautious officer, guided by his experience and training.”
 Moreover, “[a] court must consider ‘the totality of the
 circumstances—the whole picture’ in determining whether
 a reasonable suspicion” exists.

State v. Barnard, 362 N.C. 244, 246-47, 658 S.E.2d 643, 645 (2008) (citations omitted).

“[T]he ‘constitutionality of a traffic stop depends on the objective facts, not the officer’s

subjective motivation[.]’” State v. Heien, 366 N.C. 271, 276, 737 S.E.2d 351, 354

(2012) (citations omitted). The trial court’s determination of whether the totality of

the circumstances supports a reasonable suspicion that the defendant might be

engaged in criminal activity is a conclusion of law subject to de novo review. State v.

Wilson, 155 N.C. App. 89, 93-94, 574 S.E.2d 93, 97 (2002). Furthermore, the trial

court’s conclusions of law based on the totality of circumstances “‘must be legally

correct, reflecting a correct application of applicable legal principles to the facts

found.’” State v. Barden, 356 N.C. 316, 332, 572 S.E.2d 108, 121 (2002) (citations

omitted).

 -6-
 STATE V. GOINS

 Opinion of the Court

 In order to evaluate the trial court’s conclusion that the stop in the present

case was justified, we begin with the United States Supreme Court opinion Illinois v.

Wardlow, 528 U.S. 119, 145 L. Ed. 2d 570 (2000), which recognized that “flight” from

police presence can be a factor in support of finding reasonable suspicion:

 On September 9, 1995, Officers Nolan and Harvey were
 working as uniformed officers in the special operations
 section of the Chicago Police Department. The officers
 were driving the last car of a four-car caravan converging
 on an area known for heavy narcotics trafficking in order
 to investigate drug transactions. The officers were
 traveling together because they expected to find a crowd of
 people in the area, including lookouts and customers.

 As the caravan passed 4035 West Van Buren, Officer Nolan
 observed respondent Wardlow standing next to the
 building holding an opaque bag. Respondent looked in the
 direction of the officers and fled. Nolan and Harvey turned
 their car southbound, watched him as he ran through the
 gangway and an alley, and eventually cornered him on the
 street.

Id. at 121-22, 145 L. Ed. 2d at 574-75.

 It was in this context that Officer Nolan decided to
 investigate Wardlow after observing him flee. An
 individual’s presence in an area of expected criminal
 activity, standing alone, is not enough to support a
 reasonable, particularized suspicion that the person is
 committing a crime. But officers are not required to ignore
 the relevant characteristics of a location in determining
 whether the circumstances are sufficiently suspicious to
 warrant further investigation. Accordingly, we have
 previously noted the fact that the stop occurred in a “high
 crime area” among the relevant contextual considerations
 in a Terry analysis.

 -7-
 STATE V. GOINS

 Opinion of the Court

 In this case, moreover, it was not merely respondent’s
 presence in an area of heavy narcotics trafficking that
 aroused the officers’ suspicion, but his unprovoked flight
 upon noticing the police. Our cases have also recognized
 that nervous, evasive behavior is a pertinent factor in
 determining reasonable suspicion. Headlong flight—
 wherever it occurs—is the consummate act of evasion: It is
 not necessarily indicative of wrongdoing, but it is certainly
 suggestive of such. In reviewing the propriety of an
 officer’s conduct, courts do not have available empirical
 studies dealing with inferences drawn from suspicious
 behavior, and we cannot reasonably demand scientific
 certainty from judges or law enforcement officers where
 none exists. Thus, the determination of reasonable
 suspicion must be based on commonsense judgments and
 inferences about human behavior. We conclude Officer
 Nolan was justified in suspecting that Wardlow was
 involved in criminal activity, and, therefore, in
 investigating further.

 Such a holding is entirely consistent with our decision in
 Florida v. Royer, 460 U.S. 491 (1983), where we held that
 when an officer, without reasonable suspicion or probable
 cause, approaches an individual, the individual has a right
 to ignore the police and go about his business. And any
 “refusal to cooperate, without more, does not furnish the
 minimal level of objective justification needed for a
 detention or seizure.” But unprovoked flight is simply not
 a mere refusal to cooperate. Flight, by its very nature, is
 not “going about one’s business”; in fact, it is just the
 opposite. Allowing officers confronted with such flight to
 stop the fugitive and investigate further is quite consistent
 with the individual’s right to go about his business or to
 stay put and remain silent in the face of police questioning.

Id. at 124-25, 145 L. Ed. 2d at 576-77 (citations omitted). In Wardlow, the uniformed

officers involved were part of a four-car caravan entering an area of “heavy narcotics

trafficking” for the purpose of policing illegal drug activity. The officers anticipated

 -8-
 STATE V. GOINS

 Opinion of the Court

there would be large numbers of people in the area and expected “lookouts” to be

present, ready to alert those persons of police presence. The officers observed the

defendant standing near a building holding an opaque bag in his hands. When the

defendant noticed the officers, he fled on foot. The United States Supreme Court

discussed this behavior by the defendant as follows: “Headlong flight—wherever it

occurs—is the consummate act of evasion: It is not necessarily indicative of

wrongdoing, but it is certainly suggestive of such.” Id. at 124, 145 L. Ed. 2d at 576.

The Wardlow Court then clarified how this behavior was different than that in earlier

opinions, in which it had made clear that, absent reasonable suspicion to detain a

person, “[t]he person approached . . . need not answer any question put to him; indeed,

he may decline to listen to the questions at all and may go on his way.” Florida v.

Royer, 460 U.S. 491, 497-98, 75 L. Ed. 2d 229, 236 (1983) (citation omitted). Refusing

to stop for the police and “going about one’s business” cannot, absent more, justify

detention. However:

 Flight, by its very nature, is not “going about one’s
 business”; in fact, it is just the opposite. Allowing officers
 confronted with such flight to stop the fugitive and
 investigate further is quite consistent with the individual’s
 right to go about his business or to stay put and remain
 silent in the face of police questioning.

Wardlow, 528 U.S. at 125, 145 L. Ed. 2d at 577.

 In the present matter, the trial court heard the testimonies of the officers.

Officer Branson testified that he based his reasonable suspicion on the following:

 -9-
 STATE V. GOINS

 Opinion of the Court

 Time of night, prior info given by the manager about
 Apartment 408, and knowing that the complex is a high
 drug crime area, as well as the business in that
 intersection, suspicious travel, nobody entering or exiting
 the [Elantra] as it traveled through the apartment
 complex, being alerted, that an individual called out as the
 [Elantra] was traveling through and once that call was
 made by the individual the [Elantra] exited more rapidly
 than it began -- or than it was traveling, and then the quick
 exit upon that.

Officer Cole testified as follows:

 Not long after I began looking, we noticed a white Hyundai
 Elantra pull into the complex and proceed very slowly
 through. I observed no one out in the parking lot, no other
 vehicles running. As I made -- as I watched the Elantra
 and it came around the u-shaped driveway, I noticed an
 individual standing outside building 408. I advised Officer
 Branson to pay attention to that subject and the [Elantra].
 As it came around the corner and became -- or drove closer
 to that subject and that building, 408, I noticed the subject
 turn and look towards our police car, because our
 headlights at that point had basically turned to the point
 that we were lighting his direction. He looked at us, looked
 back at the Elantra, looked at us again, and then shouted
 something at the passenger side, whatever -- that was the
 side facing him -- toward the Elantra. At that point he
 began to back away and head back into the apartment
 complex. The [Elantra] sped up and pulled out of the
 parking lot. I told Officer Branson to stick with the
 [Elantra], because you can’t get both. After that we
 decided, based on the totality of the circumstances and the
 reasonable suspicion that we had at that time, that we
 would go ahead and conduct a traffic stop on the [Elantra].

As in Wardlow, the officers in the present case testified that Defendant was in an

area of high crime and drug activity. However, the testimony in Wardlow suggested

 - 10 -
 STATE V. GOINS

 Opinion of the Court

a much more active drug scene than the testimony in the present case. Officer

Branson testified that the manager of the apartment complex had informed him:

 “The apartment is getting bad again,” referring -- I’m
 assuming that she was referring to general activity, but
 she made specific mention to building 408 and that she
 believes the individuals, through what other residents
 have told her, that they are involved in the use and sale of
 illegal narcotics.

In Wardlow, the defendant was seen holding an opaque bag, which officers believed

might contain illegal drugs. In the present case, although Defendant was seen

driving in the direction of the apartment building that officers had been told might

be the site of drug transactions, officers did not observe Defendant, nor the man, in

possession of a container typical of the type used to carry illegal drugs.

 Defendant’s mere presence in an area known for criminal narcotics activity

could not, standing alone, have provided the reasonable suspicion necessary for the

officers to initiate the stop of the Elantra. As in Wardlow, the outcome in the present

case is determined by the presence or absence of additional circumstances sufficient

to rise to the level of reasonable suspicion. In Wardlow, the defendant fled on foot

after observing uniformed police officers approaching, and the causal link between

the approach of the police and the “unprovoked flight” of the defendant was easily

drawn. In the present case, that link is not as readily ascertainable. Officers Branson

and Cole both testified they could not see Defendant in his vehicle; they could not

observe Defendant’s behavior or actions, other than by observing the Elantra itself.

 - 11 -
 STATE V. GOINS

 Opinion of the Court

 Q. At the point that you were looking at . . . my client
 driving around the parking lot there. Did you see him
 with any guns or drugs?

 A. No, sir. I was across the street.

 Q. Okay. Did you see him with any paraphernalia?

 A. No, sir.

 Q. Okay. Did you see him with any money?

 A. This is why I conducted the investigative stop.

 Q. Did you see him try to destroy anything?

 A. No, sir.

 Q. Did you see him try to conceal anything?

 A. No, sir. But this all stems back to I can’t see inside of
 a vehicle from across West Meadowview Road.

Further, there was no evidence to indicate Defendant personally observed the police

car across the street before he left the parking lot of the apartment complex.

 Evidence of flight is much clearer in situations such as those in Wardlow,

where a defendant’s actions consisted of running away from police on foot, than is the

evidence in the present matter. Officer Branson testified that Defendant’s driving

“raised [his] suspicion to fleeing upon police presence, although there wasn’t like a

running flight or extreme changing from driving slowly through the [apartment]

complex to speeding up as our police vehicle was observed.” (Emphasis added).

Defendant did not break any traffic laws in his exit from the apartment complex; the

 - 12 -
 STATE V. GOINS

 Opinion of the Court

stop of the Elantra was based solely on the officers’ suspicion that Defendant had

been driving through the apartment complex in order to make a drug-related

transaction. As this Court has stated in Mello,

 merely leaving a drug-ridden area in a normal manner is
 not sufficient to justify an investigatory detention. See In
 re J.L.B.M., 176 N.C. App. 613, 619–22, 627 S.E.2d 239,
 243–45 (2006) (holding that information that a suspicious
 person wearing baggy clothes had been seen in a drug-
 ridden area and that he walked away upon the approach of
 law enforcement officers did not suffice to support an
 investigatory detention); State v. Roberts, 142 N.C. App.
 424, 430, n. 2, 542 S.E.2d 703, 708, n. 2 (2001) (stating that
 “evidence that Defendant walked away from [a police
 officer] after he asked Defendant to stop is not evidence
 that Defendant was attempting to flee from [the police
 officer] and, thus, indicates nothing more than Defendant’s
 refusal to cooperate”); State v. Rhyne, 124 N.C. App. 84, 89–
 91, 478 S.E.2d 789, 791–93 (1996) (holding that an officer
 lacked reasonable suspicion to frisk a defendant who was
 sitting in an area known to be a center of drug activity
 without taking evasive action or otherwise engaging in
 suspicious conduct); State v. Fleming, 106 N.C. App. 165,
 170–71, 415 S.E.2d 782, 785 (1992) (holding that the fact
 that defendant was standing in an open area between two
 apartment buildings and walked away upon the approach
 of law enforcement officers did not justify an investigatory
 detention).

Mello, 200 N.C. App. at 449-50, 684 S.E.2d at 492.

 In Mello, this Court held that the challenged stop was proper based upon the

following facts:

 At approximately 10:30 a.m. on 26 August 2006, Officer
 Pritchard was patrolling the area of Chandler and Amanda
 Place when he observed a vehicle driven by Defendant stop

 - 13 -
 STATE V. GOINS

 Opinion of the Court

 about fifteen to twenty yards away. At that time, Officer
 Pritchard watched “two other individuals approach the
 vehicle putting their hands into the vehicle;” however, he
 did not see any exchange or transfer of money. Officer
 Pritchard had not previously seen Defendant, but he
 recognized the two men standing outside the vehicle. He
 did not, however, know their names or whether he had
 previously arrested them. Officer Pritchard characterized
 the area of Chandler and Amanda Place as “a very well-
 known drug location” where he had previously made drug-
 related arrests.

 Based on his observation of the interaction between
 Defendant and the two individuals who approached his
 vehicle, Officer Pritchard suspected that he had witnessed
 a “drug transaction,” something he had seen on numerous
 prior occasions. After seeing the episode at Defendant’s
 automobile, Officer Pritchard drove a short distance before
 turning around. At that point, the two individuals fled the
 area, with one of them quickly entering a house. In
 addition, Defendant started driving away from the area in
 the opposite direction from that in which Officer Pritchard
 was traveling. According to Officer Pritchard, Defendant
 did not commit any traffic offense as he attempted to drive
 away. Officer Pritchard turned around again and stopped
 Defendant’s vehicle.

Id. at 438, 684 S.E.2d at 485. The Mello Court reasoned:

 The fact that the two pedestrians fled in the immediate
 aftermath of an interaction with Defendant that could be
 reasonably construed as a hand-to-hand drug transaction
 which took place in “a well[-]known drug location with high
 drug activity” would clearly have raised a reasonable
 suspicion in the mind of a competent and experienced law
 enforcement officer that further investigation was
 warranted; the fact that Defendant did not drive away at a
 high rate of speed or take some other obvious evasive action
 himself does not change that fact. The federal and state
 constitutions do not, under existing decisional authority,

 - 14 -
 STATE V. GOINS

 Opinion of the Court

 require more in order for a valid investigatory detention to
 take place.

Id. at 450-51, 684 S.E.2d at 492-93. These factors are similar to those relied upon in

Wardlow – except that the flight from the police was by the defendant in Wardlow,

whereas in Mello the flight was by the individuals who were conducting the

suspicious activity with the defendant.

 By contrast, in the present case, the officers suspected that Defendant might

be approaching the man outside building 408 to conduct a drug transaction, but

unlike in Mello, Defendant and the man were not observed conducting any suspicious

activity together. The man standing outside building 408 did not approach the

Elantra and did not reach his hand inside the Elantra. Although Officer Cole testified

he suspected the man saw the police car and then yelled a warning to Defendant, the

man and Defendant were never in close contact with each other. As with the

defendant in Mello, Defendant in the present case drove away from the scene in a

lawful manner. However, unlike in Mello, the man standing near the Elantra did not

flee upon seeing the police – he simply turned around and walked into the apartment

building. The manner in which Defendant left the parking lot of the apartment

complex cannot be reasonably described as “headlong flight.” In Wardlow, Mello, and

other cases in which “flight” has been used to render legal a stop that would have

otherwise been illegal, the officers readily observed actual flight, and based their

 - 15 -
 STATE V. GOINS

 Opinion of the Court

reasonable suspicion of criminal activity upon a totality of circumstances which

included actual observed flight.

 The dissenting opinion objects to our distinction between “actual flight” and

“suspected flight.” We simply make a distinction between evidence sufficient to

support a finding that a defendant was attempting to evade police contact and

evidence that can only support a suspicion or conjecture that a defendant was

attempting to evade police contact. Suspicion or conjecture that a defendant might

have been attempting to flee police presence, absent additional suspicious

circumstances, is insufficient to support reasonable suspicion that someone leaving a

known drug area was engaged in criminal activity. See, e.g., In re J.L.B.M., 176 N.C.

App. 613, 621-22, 627 S.E.2d 239, 245 (2006); State v. Fleming, 106 N.C. App. 165,

170-71, 415 S.E.2d 782, 785 (1992). In each of the cases cited in the dissenting opinion

there were additional elements involved, which served to raise what could have been

categorized as a mere suspicion of alleged flight to a reasonable inference that flight

had actually occurred. State v. Jackson, 368 N.C. 75, 80, 772 S.E.2d 847, 850 (2015)

(emphasis added) (“In making this determination, we are mindful of the dangers

identified by defendant in his brief and at oral argument of making the simple act of

walking in one’s own neighborhood a possible indication of criminal activity. Here,

defendant was walking in, and “the stop occurred in[,] a ‘high crime area’ [which is]

among the relevant contextual considerations in a Terry analysis.” However, we do

 - 16 -
 STATE V. GOINS

 Opinion of the Court

not hold that those circumstances, standing alone, suffice to establish the existence

of reasonable suspicion. Here, in contrast, the trial court based its conclusion on more

than defendant’s presence in a high crime and high drug area. The findings of fact

show defendant stood at 9:00 p.m. in a specific location known for hand-to-hand drug

transactions that had been the site of many narcotics investigations; defendant and

Benton split up and walked in opposite directions upon seeing a marked police vehicle

approach; they came back very near to the same location once the patrol car passed;

and they walked apart a second time upon seeing Officer Brown’s return.3 We

conclude that these facts go beyond an inchoate suspicion or hunch[.]”); State v.

Butler, 331 N.C. 227, 233, 415 S.E.2d 719, 722 (1992) (emphasis added) (“1) defendant

was seen in the midst of a group of people congregated on a corner known as a ‘drug

hole’; 2) Hedges had had the corner under daily surveillance for several months; 3)

Hedges knew this corner to be a center of drug activity because he had made four to

six drug-related arrests there in the past six months; 4) Hedges was aware of other

arrests there as well; 5) defendant was a stranger to the officers [who had been

surveilling this corner for months]; 6) upon making eye contact with the uniformed

 3 In Jackson, the defendant and his companion twice split up and walked away from a known
high drug transaction location upon seeing the police car approaching. The evidence that the
defendant in Jackson was engaging in evasive behavior was much stronger than the evidence
presently before us.

 - 17 -
 STATE V. GOINS

 Opinion of the Court

officers, defendant immediately moved away,4 behavior that is evidence of flight[.]”);

State v. Willis, 125 N.C. App. 537, 542, 481 S.E.2d 407, 411 (1997) (emphasis added)

(“Defendant left a suspected drug house just before the search warrant was executed.

Defendant set out on foot and took evasive action when he knew he was being followed.

And, at the suppression hearing, Detective Sholar testified that defendant had

exhibited nervous behavior.”). Each of these cases presents additional indicia of

potential criminal activity and flight absent from the case presently before us.

 Further, there must be some nexus between a suspect’s “flight” and the

presence of the police, and that “flight” must reasonably demonstrate “evasive

action.” State v. White, 214 N.C. App. 471, 479-80, 712 S.E.2d 921, 928 (2011); see

also J.L.B.M., 176 N.C. App. at 622, 627 S.E.2d at 245 (holding there was no

reasonable suspicion where an officer “relied solely on the dispatch that there was a

suspicious person at the Exxon gas station, that the juvenile matched the ‘Hispanic

male’ description of the suspicious person, that the juvenile was wearing baggy

clothes, and that the juvenile chose to walk away from the patrol car”); Fleming, 106

N.C. App. at 170-71, 415 S.E.2d at 785 (“In the case now before us, at the time Officer

Williams first observed defendant and his companion, they were merely standing in

an open area between two apartment buildings. At this point, they were just

 4 In Butler, there was direct evidence of cause and effect between the defendant noticing the
officers and his immediate decision to move away from the officers. Further, there was additional non-
flight evidence supporting a finding of reasonable suspicion. In the present case, there is only
conjecture that Defendant might have seen the police car across the street.

 - 18 -
 STATE V. GOINS

 Opinion of the Court

watching the group of officers standing on the street and talking. The officer observed

no overt act by defendant at this time nor any contact between defendant and his

companion. Next, the officer observed the two men walk between two buildings, out

of the open area, toward Rugby Street and then begin walking down the public

sidewalk in front of the apartments. These actions were not sufficient to create a

reasonable suspicion that defendant was involved in criminal conduct, it being

neither unusual nor suspicious that they chose to walk in a direction which led away

from the group of officers.”); cf., State v. Jackson, 368 N.C. 75, 80, 772 S.E.2d 847,

850-51 (2015) (citation omitted) (Supreme Court reversed this Court’s determination

that no reasonable suspicion existed because “the trial court based its conclusion on

more than defendant’s presence in a high crime and high drug area. The findings of

fact show defendant stood at 9:00 p.m. in a specific location known for hand-to-hand

drug transactions that had been the site of many narcotics investigations; defendant

and Benton split up and walked in opposite directions upon seeing a marked police

vehicle approach; they came back very near to the same location once the patrol car

passed; and they walked apart a second time upon seeing Officer Brown’s return. We

conclude that these facts go beyond an inchoate suspicion or hunch and provide a

‘particularized and objective basis for suspecting [defendant] of [involvement in]

criminal activity.’”).

 - 19 -
 STATE V. GOINS

 Opinion of the Court

 In the present case, the officers observed activity which made them suspect

that Defendant’s actions in leaving the apartment complex might constitute flight,

and then this suspicion of flight was used in turn to support the suspicion that

criminal activity was afoot. We hold that the record evidence does not support the

trial court’s finding that Defendant “fled” from the officers. We further hold, on these

facts, that the suspicion of flight from an area of known illegal narcotics activity, in

the form of accelerating the Elantra in a lawful manner and driving away from the

apartment complex, without more, did not justify the stop of the Elantra and the

detention of Defendant. Contrary to the assertion in the dissenting opinion, our

holding is not based solely upon the insufficiency of the evidence to support the trial

court’s finding of “flight,” but upon the totality of the circumstances in this case. The

circumstances in the present case do not include the kind of additional suspicious

activity required to form a reasonable suspicion – unlike the circumstances present

in Wardlow, Jackson, Butler, Willis, and similar opinions. We reverse the trial court’s

denial of Defendant’s motion to suppress and remand to the trial court for further

action consistent with this opinion.

 REVERSED AND REMANDED.

 Judge INMAN concurs.

 Judge TYSON dissents with separate opinion.

 - 20 -
 No. COA15-1183 – State v. Goins

 TYSON, Judge, dissenting.

 These experienced officers had reasonable, articulable, and objective suspicion

to initiate a lawful investigatory stop of Defendant’s vehicle, based upon the totality

of the circumstances. The trial judge’s underlying findings of fact are supported by

competent evidence, and are conclusively binding on appeal. These findings support

the trial judge’s ultimate conclusions of law to deny Defendant’s motion to suppress.

 The majority’s conclusion to reverse the trial court’s order is unduly focused

upon their characterization of Defendant’s flight, while disregarding the “totality of

the circumstances.” Their conclusion ignores or minimizes all the surrounding

factors, and is contrary to controlling decisions of the Supreme Court of the United

States, the Supreme Court of North Carolina, and this Court. See United States v.

Cortez, 449 U.S. 411, 417, 66 L. Ed. 2d 621, 629 (1981). I respectfully dissent.

 I. Standard of Review

 [T]he scope of appellate review of [a denial of a motion to
 suppress] is strictly limited to determining whether the
 trial judge’s underlying findings of fact are supported by
 competent evidence, in which event they are conclusively
 binding on appeal, and whether those factual findings in
 turn support the judge’s ultimate conclusions of law.

State v. Cooke, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982) (citations omitted).

 A trial court’s findings of fact are binding on appeal “if there is evidence to

support them, even though the evidence might sustain findings to the contrary.”
 STATE V. GOINS

 TYSON, J., dissenting

Adams v. Tessener, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001) (emphasis supplied)

(citations and quotation marks omitted).

 II. Analysis

 “An investigatory stop must be justified by ‘a reasonable suspicion, based on

objective facts, that the individual is involved in criminal activity.’” State v. Watkins,

337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994) (quoting Brown v. Texas, 443 U.S. 47, 51,

61 L. Ed. 2d 357, 362 (1979)). A court must consider “the totality of the

circumstances—the whole picture” to determine whether reasonable suspicion to

make an investigatory stop exists. Cortez, 449 U.S. at 417, 66 L. Ed. 2d at 629.

 An investigatory stop is reviewed for “specific and articulable facts, as well as

the rational inferences from those facts, as viewed through the eyes of a reasonable,

cautious officer, guided by his experience and training.” State v. Mello, 200 N.C. App.

437, 443-44, 684 S.E.2d 483, 488 (2009) (citing Terry v. Ohio, 392 U.S. 1, 21-22, 20 L.

Ed. 2d 889, 906 (1968)). “The only requirement is a minimal level of objective

justification, something more than an ‘unparticularized suspicion or hunch.’” Mello,

200 N.C. App. at 444, 684 S.E.2d at 488 (quoting United States v. Sokolow, 490 U.S.

1, 7, 104 L. Ed. 2d 1, 10 (1989)).

 The Supreme Court of the United States has held an individual’s mere

presence in a neighborhood frequented by drug users is an insufficient basis, standing

alone, for concluding a defendant himself is engaged in criminal activity. Brown, 443

 2
 STATE V. GOINS

 TYSON, J., dissenting

U.S. at 52, 61 L. Ed. 2d at 362-63. However, an individual’s flight from uniformed

law enforcement officers is an additional factual circumstance, within “the totality of

the circumstances” which may be used to support a reasonable suspicion of criminal

activity. See State v. Butler, 331 N.C. 227, 234, 415 S.E.2d 719, 722-23 (1992) (holding

defendant’s presence on specific corner known for drug activity, coupled with fact that

“defendant immediately moved away” upon making eye contact with officers, was

sufficient suspicion for officers to make a lawful stop).

 At Defendant’s suppression hearing, Officer Cole testified he observed a

vehicle enter the Spring Manor apartment complex. Officer Cole stated: “The car

proceeded through the parking lot slowly, never stopping, though, at any particular

building. Once I noticed the individual standing outside of [building] 408, it appeared

that he was waiting on that vehicle.” No other individuals were outside of building

408, the immediate area or in the parking lot at that time after midnight.

 Officer Cole continued to testify: “As that car came around the corner, that’s

when [the individual standing outside] noticed us and looked at the vehicle. When

the vehicle made the turn he yelled something to them, which caused them to speed

up and leave the complex, and he backed up and went back into the apartment.”

 Officer Cole testified he believed “that car was coming to visit that individual

standing outside 408” and intended “to either purchase or sell illegal drugs.” The

individual outside of building 408 “warned [Defendant] that [the officers] were across

 3
 STATE V. GOINS

 TYSON, J., dissenting

the street, and they drove out and left and [the individual standing outside] went

back into his apartment.” These articulated and reasonable suspicions are an

unbroken chain of events and were based on Officer Cole’s training and experience.

Officer Cole testified to “seven-plus years as an experienced Greensboro police officer”

and had prior knowledge of illegal narcotics being sold out of apartment building 408.

 Officer Branson also testified he was aware of illegal activities taking place in

the Spring Manor apartment complex, prior to the date in question. Officer Branson

testified the apartment complex manager reported other residents had specifically

mentioned individuals in building 408 were involved in the use and sale of illegal

narcotics.

 Officer Branson testified he observed “the individual [outside of building 408]

yelling and then looking back at [Defendant’s] vehicle, and at that point [Defendant]

increased his speed and exited the parking lot much more rapidly than he was

traveling initially.” After the yell, he saw the unbroken sequence of the vehicle

“chang[e] from driving slowly through the complex to speeding up as our police vehicle

was observed.” The person who had yelled, “backed up and went back into the

apartment [408].” Officer Branson testified this behavior “raised [his] suspicion to

fleeing upon police presence.” From the time of the event until the stop, the officers

never lost sight of the vehicle with Defendant inside.

 4
 STATE V. GOINS

 TYSON, J., dissenting

 Based on these officers’ testimonies, the trial court made the following

pertinent findings of fact:

 5) . . . Officers Branson and Cole were in a highly visible,
 marked, Greensboro Police Department patrol vehicle and
 located in the Spring Valley Shopping Center parking lot
 area, directly across the street from the Spring Manor
 apartment complex.

 6) Prior to 14 July 2014, Officer Cole had made numerous
 illegal drug arrests in the Spring Manor apartment
 complex and in the immediate area of the Spring Manor
 apartment complex.

 7) As of 14 July 2014, Officer Cole knew that the Spring
 Manor apartment complex and its immediate surrounding
 area was an “open air drug market.”

 8) Prior to 14 July 2014, the manager of the Spring Manor
 apartment complex informed Officer Branson that the
 Spring Manor apartments were getting worse, and
 specifically identified apartment [building] 408 as a place
 for using illegal drugs and for the sale and distribution of
 illegal drugs.

 9) Prior to 14 July 2014, Officer Branson was aware of
 numerous crimes that had been committed in the Spring
 Manor apartment complex.

 10) As of 14 July 2014, Officers Branson and Cole knew
 that the Spring Manor apartment complex was in a high
 drug and crime-ridden area.

 ....

 12) On Monday morning at approximately 12:15 a.m. on
 14 July 2014, Officers Branson and Cole observed a white,
 Hyundai Elantra (“Elantra”), enter the Spring Manor

 5
 STATE V. GOINS

 TYSON, J., dissenting

 apartment complex parking lot, circling the parking lot at
 a very slow rate of speed.

 13) Officers Branson and Cole observed that the Elantra
 never pulled into any parking space or stopped anywhere
 but instead drove at a very slow rate of speed toward the
 area of Spring Manor apartment [building] 408.

 14) Almost simultaneously to observing the Elantra as set
 forth above, Officers Branson and Cole observed a male
 directly in front of Spring Manor apartment [building] 408.

 15) Thereafter, Officers Branson and Cole observed said
 male directly in front of Spring Manor apartment
 [building] 408 look directly at their highly visible, marked,
 Greensboro Police Department patrol vehicle that was in
 plain view and only a short distance away from said male.

 16) Officers Branson and Cole next observed said male,
 after identifying their Greensboro Police Department
 patrol vehicle as set forth above, look directly at the
 Elantra, which was by then only a short distance away
 from said male, and make a loud warning noise, which was
 heard by Officer Cole.

 17) Immediately after making said warning noise as set
 forth above, Officers Branson and Cole observed the
 Elantra accelerate and quickly exit the Spring Manor
 apartment complex and flee the area unprovoked, and flee
 from Officers Branson and Cole unprovoked.

Based on these findings of fact, the trial court concluded:

 1) Based on the totality of the circumstances, the State has
 proven by a preponderance of the credible and believable
 evidence that the investigatory stop of the Elantra driven
 by Defendant in this case was based on specific and
 articulable facts, as well as the rational inferences from
 those facts as viewed through the eyes of a reasonable,
 cautious officer, guided by his experience and training.

 6
 STATE V. GOINS

 TYSON, J., dissenting

 2) Based on the totality of the circumstances, . . . the
 investigatory stop of the Elantra driven by Defendant was
 legal and valid, and that Officers Branson and Cole had a
 reasonable and articulable suspicion for making the
 investigatory stop of said Elantra.

 3) Based on the totality of the circumstances, . . . Officers
 Branson and Cole had a reasonable suspicion supported by
 articulable facts that criminal activity may be afoot.

 Considering these undisputed facts and the officers’ testimonies at Defendant’s

suppression hearing, the trial court’s findings of fact, particularly that the officers

“observed [Defendant] accelerate and quickly exit the Spring Manor apartment

complex and flee the area,” are amply supported by competent record evidence. These

findings of fact in turn support the trial court’s conclusion of law that the officers had

“a reasonable suspicion . . . that criminal activity may be afoot” to justify their

investigative stop of Defendant’s vehicle. Mello, 200 N.C. App. at 439, 684 S.E.2d at

486.

 The majority’s protestations to the contrary, their reversal of the trial court’s

ruling apparently turns on a notion of, and fictional distinction between, “suspected”

versus “actual” flight and not from the “totality of the circumstances.” No precedents

lend support to this contrived distinction. See State v. Jackson, 368 N.C. 75, 80, 772

S.E.2d 847, 850 (2015) (holding reasonable suspicion justified investigatory stop

where defendant stood “in a specific location known for hand-to-hand drug

transactions” and defendant and another “split up and walked in opposite directions

upon seeing a marked police vehicle approach); Butler, 331 N.C. at 234, 415 S.E.2d

 7
 STATE V. GOINS

 TYSON, J., dissenting

at 722-23 (holding defendant’s presence in neighborhood frequented by drug users,

coupled with him immediately leaving the corner and walking away after making eye

contact with officers, constituted reasonable suspicion to conduct investigatory stop);

In re I.R.T., 184 N.C. App. 579, 585-86, 647 S.E.2d 129, 134-35 (2007) (holding officer

had reasonable grounds to conduct investigatory stop where juvenile in known high

drug area began walking away as officer approached him, while keeping his head

turned away from officer); State v. Willis, 125 N.C. App. 537, 542, 481 S.E.2d 407, 411

(1997) (holding officers had reasonable suspicion to conduct investigatory stop of

defendant where he was seen leaving a suspected drug house and officers observed

him “exhibit[ing] nervous behavior” when he knew he was being followed). Whether

Defendant’s speed exceeded the posted speed limit or violated some other motor

vehicle law is not determinative of Defendant’s flight from the known drug area.

 Considering the past history of drug activity and arrests at the Spring Manor

Apartments, the time, place, manner, the unbroken sequence of observed events,

Defendant’s actions upon being warned and the “totality of the circumstances,” the

officers’ testimonies and the trial court’s findings of fact “go beyond an inchoate

suspicion or hunch and provide a particularized and objective basis for suspecting

defendant of involvement in criminal activity.” Jackson, 368 N.C. at 80, 772 S.E.2d

at 850-51 (citation and internal quotation marks omitted). The trial court correctly

found and concluded the officers had a reasonable and articulable suspicion, based

 8
 STATE V. GOINS

 TYSON, J., dissenting

upon the totality of the circumstances, to conduct a lawful investigatory stop of

Defendant’s vehicle. The trial court did not err by denying Defendant’s motion to

suppress evidence recovered as a result of the lawful investigatory stop.

 III. Conclusion

 The trial court’s findings of fact are supported by competent testimonial and

record evidence. These findings of fact are “conclusively binding on appeal[.]” Cooke,

306 N.C. at 134, 291 S.E.2d at 619. These findings of fact in turn support the trial

court’s ultimate conclusions citing the “totality of the circumstances” that the officers

had reasonable suspicion to conduct a lawful investigatory stop of Defendant’s

vehicle. The trial court’s findings of fact are binding upon this Court on appeal where

“there is evidence to support them, even though the evidence might sustain findings

to the contrary.” Adams, 354 N.C. at 63, 550 S.E.2d at 503.

 I vote to affirm the trial court’s denial of Defendant’s motion to suppress and

find no error in Defendant’s convictions or the judgment entered thereon. I

respectfully dissent.

 9