STATE OF NORTH CAROLINA v. JOHN EDWARD BUTLER

No. 361A91

(Filed 22 April 1992)

1. Searches and Seizures § 12 (NCI3d)— stop and frisk—drug corner—lawful—evidence admissible

Evidence of defendant's purchase of a .12 gauge shotgun from a pawnshop and testimony about statements defendant made to a Tampa, Florida officer were not inadmissible as the fruits of an illegal search and seizure under the North Carolina and United States Constitutions where defendant was seen in the midst of a group of people congregated on a corner known in Tampa as a "drug hole"; the officer had had the corner under daily surveillance for several months; the officer knew this corner to be a center of drug activity because he had made four to six drug related arrests there in the past six months; the officer was aware of other arrests there as well; defendant was a stranger to the officers; upon making eye contact with the uniformed officers, defendant immediately moved away, behavior that is evidence of flight; and it was the officer's experience that people involved in drug traffic are often armed. While none of these circumstances alone necessarily satisfies Fourth Amendment requirements, when considered in their totality, the officer had sufficient suspicion to make a lawful stop.

**Am Jur 2d, Searches and Seizures §§ 41, 43, 44, 58, 103.**

**Law enforcement officer's authority, under Federal Constitution's Fourth Amendment, to stop and briefly detain, and to conduct limited protective search of or "frisk," for investigative purposes, persons suspected of criminal activity— Supreme Court cases. 104 L. Ed. 2d 1046.**

2. Evidence and Witnesses § 1694 (NCI4th)— murder—photograph of victim—admissible

The trial court did not err in a prosecution for assault and murder by admitting an autopsy photograph of the victim showing her bare breast. The trial court acted within its sound discretion in ruling under N.C.G.S. § 8C-1, Rule 403 that the probative value of the unaltered photograph was not substantially outweighed by any prejudice.

STATE v. BUTLER

[331 N.C. 227 (1992)]

Am Jur 2d, Homicide §§ 417-419.

Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.

3. Evidence and Witnesses §§ 635, 423 (NCI4th)— in-court identification—pretrial photographic lineup—failure to conduct voir dire—no prejudicial error

There was no prejudicial error in a prosecution for assault and murder where defendant objected to the State's question asking the witness to identify his assailant; the trial court overruled the objection and allowed the witness to point to defendant; the trial court then excused the jury to ask defense counsel about the basis of defendant's objection; and, upon confirming that the objection was based on an underlying objection to an allegedly suggestive photographic lineup, the trial court summarily overruled defendant's objection, brought the jury back to the courtroom, and allowed the witness to identify defendant a second time. The trial court's failure to conduct a voir dire in order to determine the admissibility of in-court identification testimony allegedly tainted by a suggestive pretrial photographic lineup was error. However, where, as here, there is clear and convincing evidence that the witness knew and was familiar with the defendant, that the witness had ample and clear opportunity to observe the defendant as he committed the crime, and that the witness consistently identified the defendant as the perpetrator, the failure of the trial court to conduct a voir dire on the possibility of taint from a suggestive photographic lineup is harmless.

Am Jur 2d, Evidence §§ 371.8, 372.

4. Evidence and Witnesses § 3205 (NCI4th)— murder and assault—identity of defendant as perpetrator—contradictions and discrepancies in testimony

The State presented substantial evidence that defendant was the perpetrator of an assault and murder despite contradictions and discrepancies in the witnesses' testimony and in their descriptions of the perpetrator. Those are matters within the special province of the jury.

Am Jur 2d, Evidence § 1143; Homicide § 435.

5. **Homicide § 246 (NCI4th); Assault and Battery § 26 (NCI4th) — assault and murder — evidence of premeditation and deliberation and of intent to kill — sufficient**

There was sufficient evidence of premeditation and deliberation and of intent to kill in a prosecution for assault and murder where there was evidence that defendant was frustrated by a club owner's refusal to accept insufficient payment for the food defendant ordered; Glenda Love, as the messenger between defendant and the owner, became the focus of defendant's frustration; at least enough time passed between the first and second shots for a victim to yell at defendant; defendant pumped his sawed-off shotgun and fired a second time at Glenda and the second victim; defendant then turned and fired one more time in the direction of the bar, wounding at least one more person; and defendant then covered the gun and fled.

**Am Jur 2d, Homicide § 439.**

6. **Assault and Battery § 22 (NCI4th) — assault with a deadly weapon with intent to kill inflicting serious injury — evidence of serious injury**

There was sufficient evidence of the element of serious injury in an assault prosecution despite the victim's testimony that he was released from the hospital the night of the shooting and missed only one day of work where the victim also testified that he was hospitalized for gunshot wounds to the back and hip, that he continued to experience pain even at the time of the trial from the shot still lodged in his body, that he did not have the luxury of foregoing work for any length of time, and that he was limited on returning to work in the tasks he could perform.

**Am Jur 2d, Assault and Battery § 48.**

APPEAL of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Britt, J.,* at the 4 March 1991 Criminal Session of Superior Court, ROBESON County, upon a jury verdict finding defendant guilty of first-degree murder. On 23 August 1991 this Court allowed defendant's motion to bypass the Court of Appeals as to additional judgments of imprisonment. Heard in the Supreme Court 10 March 1992.

STATE v. BUTLER

[331 N.C. 227 (1992)]

*Lacy H. Thornburg, Attorney General, by David F. Hoke, Assistant Attorney General, for the State.*

*Angus Thompson, Public Defender, by Gayla Graham Biggs, Assistant Public Defender, for defendant appellant.*

WHICHARD, Justice.

Defendant was indicted for one count of first-degree murder and two counts of assault with a deadly weapon with intent to kill inflicting serious injury. After a noncapital trial, a jury found defendant guilty of first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, and assault with a deadly weapon. The trial court sentenced defendant to life imprisonment for the murder conviction, fifteen years imprisonment for the first assault conviction, and two years imprisonment for the other assault conviction. On appeal, defendant raises four assignments of error. We find no prejudicial error.

All three offenses arose from a shooting incident on the night of 18 August 1989. Near midnight, a man later identified as defendant shot four people in the parking lot of a club in Lumberton called Studio 41. One of the victims, Glenda Sue Love, died; a second victim, Laura Locklear, suffered a gunshot wound in the leg; the third victim, Darnell Singletary, sustained gunshot wounds in the hip and the back; and the final victim, Kenny Earl Smith, received a gunshot wound to the arm.

The owner of the club, Morris Whitted, who had known defendant for years, testified that on the night in question he refused to sell defendant some food as defendant did not have sufficient funds to pay the price. Whitted then saw defendant confer with Glenda Love, who came to the counter to mediate for defendant. Apparently, Whitted did not accede to her request, at which point Glenda left the bar. A few minutes later Whitted heard shots, opened the door to the club, and saw Glenda lying on the ground.

According to witnesses, three shots were fired. Darnell Singletary testified that defendant fired the first two shots in his and Glenda's direction. Darnell had exited the club to leave, calling to Glenda that he was going. She came up to him and talked to him in the parking lot for a few minutes. Defendant approached the two and Glenda walked off a short distance to talk to him. As she was walking back to Darnell, Darnell heard the first shot,

which hit Glenda, then hit Darnell. Glenda fell into Darnell's arms, and Darnell shouted to defendant, "Hey, you crazy m----f----, what you shooting for?" Defendant stepped closer and shot again as Darnell and Glenda fell to the ground. Defendant fired the third and final shot in the direction of the bar, hitting Kenny Smith, who had been talking to an acquaintance in the parking lot. While it is unclear when and how Laura Locklear was hit, Kenny Smith testified that she was standing next to Glenda Love when Love was hit and fell. Authorities were unable to locate Locklear for the trial.

On the night of the shooting and at the hospital, officers questioned Darnell, who was uncooperative, angry, and in pain. Darnell did not identify the perpetrator that night. The next day, however, he told Officer Downing the perpetrator was named Butler and had dreadlocks. On 26 August, Darnell again named Butler as the perpetrator, describing him as follows: a black male, five feet ten inches tall, long hair, gold tooth, and usually wearing sunglasses and a navy blue baseball cap. Although Kenny Smith did not actually see the perpetrator as he (Kenny) was shot, he testified that a man who had been talking to Glenda Love was the perpetrator. That man, Kenny told officers at the hospital, was five feet five inches tall, dark skinned, with a thick moustache and close-cut hair, and wearing blue jeans and a short black leather jacket over the gun. Dennis Love, the brother of victim Glenda Love, testified that the perpetrator wore a long trench coat over the gun.

Officers at the scene recovered shells from a .12 gauge shotgun. Pathologist Bob Barcus Andrews opined that the perpetrator would have been two to six feet from Glenda when he shot her.

[1] In his first assignment of error, defendant contends that evidence of his purchase of a .12 gauge shotgun from a Fayetteville pawnshop and testimony about statements he made to Officer Ernesto Hedges of the Tampa, Florida Police Department were inadmissible as the fruits of an illegal search and seizure under the North Carolina and United States Constitutions. U.S. Const. amend. IV; N.C. Const. art. I, § 20. The pawnshop owner and an employee confirmed at trial that defendant bought a .12 gauge shotgun from them on 29 July 1989. Officer Hedges obtained the gun purchase receipt and the statements on 11 October 1989 while on patrol as a uniformed officer assigned to a specialty drug unit in Tampa. Hedges and his partner saw defendant, an unfamiliar

figure, standing with a group of people on a Tampa street corner known as a "drug hole," an area frequented by drug dealers and users. Hedges had had the area under daily surveillance for several months. In the past six months, Hedges had made four to six arrests at the corner and knew that other arrests had occurred there. As Hedges and his partner approached the group, defendant and the officers made eye contact, at which point defendant immediately turned and walked away.

Their suspicions raised, the officers followed defendant and asked him for identification. Defendant handed Hedges a Florida driver's license. Before Hedges accepted the identification, he frisked defendant's person. Hedges testified that he conducted the frisk in order to discover any weapons and for his own protection during the face-to-face encounter with a person he suspected of drug activity. Upon obtaining the driver's license, Hedges followed normal procedure and called the information in on his hand-held radio in order to obtain any outstanding arrest warrants. When the response was negative as to any Florida warrants, Hedges returned defendant's license. As defendant walked away, however, the police dispatcher called over the radio that defendant had an outstanding warrant for homicide in North Carolina. At that point Hedges approached defendant and arrested him.

Before placing defendant in the police car, Hedges advised defendant of his rights and the murder charge against him, executed a search incident to arrest, and removed defendant's wallet. At the police station, an inventory search of the wallet produced the pawnshop purchase receipt. After processing defendant at the police station, Hedges and his partner transported defendant to the county jail. On the way, defendant made the following spontaneous, unsolicited statement: "I don't remember any of it. You know what drugs do to you." At the jail, defendant made a second spontaneous statement when he asked Hedges, "Which one died, the man or the woman?" While defendant gave a different version of his encounter with Officer Hedges, the trial court found the facts as set forth in Hedges' account and concluded that both the purchase receipt and the statements were admissible.

The State contended in its brief and in oral arguments that the officers did not make a detention triggering the Fourth Amendment because the officers "never restrained the defendant's freedom to walk away." The United States Supreme Court has stated that

it is "sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his . . . body . . . is not a 'search.' " *Terry v. Ohio*, 392 U.S. 1, 16, 20 L. Ed. 2d 889, 903 (1968). Hedges' frisking of defendant elevated the police action here beyond a mere request for identification. *Id.* at 16-19, 20 L. Ed. 2d at 903-05; *see also United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509 ("[e]xamples of circumstances that might indicate a seizure . . . [include] some physical touching of the person . . ."), *reh'g denied*, 448 U.S. 908, 65 L. Ed. 2d 1138 (1980). Hedges thus must have acted upon "specific and articulable facts" that led him to conclude that defendant was, or was about to be, engaged in criminal activity and that defendant was "armed and presently dangerous." *Terry*, 392 U.S. at 21, 24, 20 L. Ed. 2d at 906, 908; *accord, State v. Rinck*, 303 N.C. 551, 559-61, 280 S.E.2d 912, 919-20 (1981) ("[i]f upon detaining the individual, the officer's personal observations confirm that criminal activity may be afoot and suggest that the person detained may be armed, the officer may frisk him as a matter of self-protection"); *State v. Streeter*, 283 N.C. 203, 210, 195 S.E.2d 502, 506-07 (1973).

In determining whether the *Terry* standard is met, we must consider Hedges' actions in light of the totality of the circumstances. *Rinck*, 303 N.C. at 559, 280 S.E.2d at 919; *Streeter*, 283 N.C. at 210, 195 S.E.2d at 506. Those circumstances are: 1) defendant was seen in the midst of a group of people congregated on a corner known as a "drug hole"; 2) Hedges had had the corner under daily surveillance for several months; 3) Hedges knew this corner to be a center of drug activity because he had made four to six drug-related arrests there in the past six months; 4) Hedges was aware of other arrests there as well; 5) defendant was a stranger to the officers; 6) upon making eye contact with the uniformed officers, defendant immediately moved away, behavior that is evidence of flight; and 7) it was Hedges' experience that people involved in drug traffic are often armed.

While no one of these circumstances alone necessarily satisfies Fourth Amendment requirements, we hold that, when considered in their totality, Officer Hedges had sufficient suspicion to make a lawful stop. Hedges observed defendant not simply in a general high crime area, but on a specific corner known for drug activity and as the scene of recent, multiple drug-related arrests. *See United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984) (presence of defendants in area that recently had experienced "a spate of

burglaries"); *United States v. Magda,* 547 F.2d 756, 758-59 (2d Cir. 1976) (two suspects observed one hundred feet west of a park which was under twenty-four hour surveillance for drug activity), *cert. denied,* 434 U.S. 878, 54 L. Ed. 2d 157 (1977). The United States Supreme Court has held that mere presence in a neighborhood frequented by drug users is not, standing alone, a basis for concluding that the defendant was himself engaged in criminal activity. *Brown v. Texas,* 443 U.S. 47, 52, 61 L. Ed. 2d 357, 362-63 (1979). Here, however, there was an additional circumstance — defendant's immediately leaving the corner and walking away from the officers after making eye contact with them. *See United States v. Jones,* 619 F.2d 494, 498 (5th Cir. 1980) (individual's flight from uniformed law enforcement officer may be fact used to support reasonable suspicion "that criminal activity is afoot"); *Magda,* 547 F.2d at 758-59 (defendant's companion immediately moved away with a "rapid motion" after looking in direction of observing officer); *State v. Belton,* 441 So. 2d 1195, 1198 (La. 1983) (flight, nervousness, or a startled look at the sight of an officer may be a factor leading to reasonable suspicion), *cert. denied,* 466 U.S. 953, 80 L. Ed. 2d 543 (1984).

Upon approaching defendant, Hedges lawfully performed a limited frisk to discover any weapons on defendant's person. *Terry,* 392 U.S. at 24, 20 L. Ed. 2d at 908; *Streeter,* 283 N.C. at 210, 195 S.E.2d at 506-07. In concluding that defendant, as a person reasonably suspected of involvement in drug traffic, might be armed, Hedges was entitled to formulate "common-sense conclusions" about "the modes or patterns of operation of certain kinds of lawbreakers." *United States v. Cortez,* 449 U.S. 411, 418, 66 L. Ed. 2d 621, 629 (1981); *accord United States v. Sokolow,* 490 U.S. 1, 8, 104 L. Ed. 2d 1, 10 (1989); *cf. Terry,* 392 U.S. at 28, 20 L. Ed. 2d at 910 (given the actions of suspects that suggested a daylight robbery, officer could reasonably assume suspects might be armed).

Because the "stop and frisk" of defendant was lawful, the receipt and statements were not the poisonous fruits of an illegal search and seizure. Hedges obtained defendant's wallet as part of a proper search incident to arrest. *See Chimel v. California,* 395 U.S. 752, 764-68, 23 L. Ed. 2d 685, 694-97, *reh'g denied,* 396 U.S. 869, 24 L. Ed. 2d 124 (1969). The Tampa police discovered the receipt while conducting a lawful inventory search of the wallet at the police station. *See Illinois v. Lafayette,* 462 U.S. 640, 646-48, 77 L. Ed. 2d 65, 71-73 (1983). Finally, defendant uttered his in-

criminating statements spontaneously, without any compulsion or questioning by the officers. They thus were admissible. *See, e.g., State v. McQueen*, 324 N.C. 118, 128, 377 S.E.2d 38, 44 (1989); *State v. Porter*, 303 N.C. 680, 691-92, 281 S.E.2d 377, 385 (1970).

[2] In his second assignment of error, defendant argues that the trial court erred in admitting a photograph of victim Glenda Love, taken at her autopsy and showing her bare breast. Defendant contends that the photograph impermissibly inflamed the passions of the jury to defendant's prejudice. Dr. Bob Barcus Andrews, the pathologist who performed the autopsy, testified that he took the photograph himself. The trial court denied defendant's motion to cover the breast area of the body, accepting the State's explanation that to cover an area of the already small Polaroid photograph would diminish the use of the photograph in illustrating the location of the victim's wounds.

"This Court has rarely held the use of photographic evidence to be unfairly prejudicial, and the case presently before us is distinguishable from the few cases in which we have so held." *State v. Robinson*, 327 N.C. 346, 357, 395 S.E.2d 402, 409 (1990). Where, as here, Dr. Andrews used the one photograph to illustrate his testimony about the cause of death and the nature and location of the wound, the danger of redundant and excessive use of potentially inflammatory photographs is not present. *See State v. Hennis*, 323 N.C. 279, 284-85, 372 S.E.2d 523, 526-27 (1988). The trial court acted within its sound discretion in ruling, under Rule 403 of the North Carolina Rules of Evidence, that the probative value of the unaltered photograph was not substantially outweighed by any prejudice. N.C.G.S. § 8C-1, Rule 403 (1988).

[3] Defendant assigns as error the admission of Darnell Singletary's in-court identification of defendant as the man who shot him. The State contends that this assignment of error must fail because defendant did not object in a timely manner to the identification. Our review of the record reveals otherwise; prior to Darnell's in-court indication of defendant as the perpetrator, defense counsel objected to the State's question asking the witness to identify his assailant. The trial court overruled the objection and allowed Darnell to point to defendant. Belatedly, the trial court excused the jury to ask defense counsel about the basis of the objection. Upon confirming that defense counsel's objection was based on an underlying objection to an allegedly suggestive pretrial photo-

STATE v. BUTLER

[331 N.C. 227 (1992)]

graphic line-up, the trial court summarily overruled defendant's objection, brought the jury back into the courtroom, and allowed Darnell to identify defendant a second time, again over a defense objection.

The trial court's failure to conduct a *voir dire* in order to determine the admissibility of in-court identification testimony allegedly tainted by a suggestive pretrial photographic line-up was error. *State v. Stepney*, 280 N.C. 306, 314, 185 S.E.2d 844, 850 (1971). In *Stepney*, however, we held that where

the pretrial viewing of photographs was free of impermissible suggestiveness, and the evidence is clear and convincing that the defendant's in-court identification originated with observation of defendant at the time of the robbery and not with the photographs, the failure of the trial court to conduct a voir dire and make findings of fact . . . must be deemed harmless error.

*Id.*

Because defendant failed to include the photographs from the line-up in the record on appeal, we are unable to determine whether the line-up was indeed impermissibly suggestive. The record does reveal, however, clear and convincing evidence that Darnell Singletary's identification of defendant as the perpetrator originated with his observation of defendant at the time of the shooting. That evidence includes the following: 1) while it was night when the shooting occurred, the parking lot was illuminated by a security light on the corner of Studio 41 and by streetlights; 2) Darnell was familiar with defendant's appearance and dress that night, as he had seen him earlier at the home of a mutual acquaintance where defendant had requested a cigarette of Darnell; 3) shortly thereafter, Darnell saw defendant and greeted him in the club parking lot; 4) minutes before the shooting, defendant walked up to Darnell Singletary and Glenda Love; 5) Darnell had ample opportunity to observe defendant as the perpetrator when Darnell called out in amazement to him after the first shot and as defendant approached the felled Singletary and Love within two to six feet to shoot at them a second time; and 6) while an angry and uncooperative Darnell did not identify defendant at the hospital on the night of the shooting, he did identify defendant the next morning and again a week later. Under these circumstances, it is clear

that Darnell was able to recognize defendant in the parking lot and to observe him as he fired the shots.

Assuming, *arguendo*, that the photographic line-up was impermissibly suggestive, we hold that satisfaction of the second prong in *Stepney*, the presence of clear and convincing evidence of the independent origin of the identification, renders the trial court's failure to conduct a *voir dire* harmless. Unlike in *Stepney*, the witness here knew the defendant prior to the time of the shooting. The danger that a suggestive photographic line-up will result in a misidentification is much greater when the witness has never seen the perpetrator prior to the time of the crime. *See Simmons v. United States*, 390 U.S. 377, 383, 19 L. Ed. 2d 1247, 1253 (1968) (if a witness only obtained a brief glimpse of a criminal, a subsequent photographic display might cause the witness to retain an image of the photograph rather than an image of the person actually seen). Darnell had worked daily with defendant in tobacco for the two weeks preceding the shooting. They had mutual acquaintances and frequented the same night entertainment spots. Where, as here, there is clear and convincing evidence that the witness knew and was familiar with the defendant, that the witness had ample and clear opportunity to observe the defendant as he committed the crime, and that the witness consistently identified the defendant as the perpetrator, we hold that the failure of the trial court to conduct a *voir dire* on the possibility of taint from a suggestive photographic line-up is harmless.

[4] As a final assignment of error, defendant contends that the trial court erred in denying the following motions: a motion to dismiss the charges at the close of the State's evidence; a motion to dismiss at the close of all the evidence; a motion not to instruct the jury on the charge of first-degree murder because there was insufficient evidence to support the charge; and a motion to dismiss the verdicts on the grounds of insufficient evidence to sustain the convictions. Defendant first argues that the State failed to present substantial evidence that defendant was the perpetrator of the crimes. A guilty verdict will be upheld if the State presents substantial evidence—relevant evidence which a reasonable mind might accept as adequate to support a conclusion—of each element of the offense charged. *State v. Black*, 328 N.C. 191, 199, 400 S.E.2d 398, 403 (1991). Contrary to defendant's argument, the State presented substantial evidence that defendant was the perpetrator of the crimes charged. The contradictions and discrepancies in the

witnesses' testimony and in their descriptions of the perpetrator, to which defendant points, are matters within the special province of the jury to resolve. *Id.*

**[5]** In the alternative, defendant argues that because the State failed to present substantial evidence of the element of premeditation and deliberation of first-degree murder, the trial court erred in instructing the jury on first-degree murder. "It is well settled that instructions are not improper if based upon 'some reasonable view of the evidence.' " *State v. Garner,* 330 N.C. 273, 295, 410 S.E.2d 861, 874 (1991) (quoting *State v. Buchanan,* 287 N.C. 408, 421, 215 S.E.2d 80, 88 (1975)). Because "[n]either premeditation nor deliberation is usually susceptible of direct proof," this element of first-degree murder usually rests on circumstantial evidence. *Id.,* 410 S.E.2d at 873.

This Court has identified a number of circumstances that may be considered in determining whether a killing was committed with premeditation and deliberation. *See, e.g., State v. Quesinberry,* 319 N.C. 228, 231, 354 S.E.2d 446, 448 (1987), *on remand,* 325 N.C. 125, 381 S.E.2d 681 (1989), *cert. granted and judgment vacated,* 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand,* 328 N.C. 288, 401 S.E.2d 632 (1991). Such circumstances existed in this case in the following forms: 1) evidence that defendant was frustrated by Whitted's refusal to accept insufficient payment for the food defendant ordered at the counter; 2) evidence that Glenda Love, as the messenger between defendant and Whitted, became the focus of defendant's frustration; 3) evidence that at least enough time passed between the first and second shots for Darnell to yell at defendant; 4) evidence that defendant pumped his sawed-off shotgun and fired a second time at the fallen Glenda and Darnell; 5) evidence that defendant then turned and fired one more time in the direction of the bar, wounding at least one more person; and 6) evidence that defendant then covered the gun and fled. From this evidence, a reasonable person could conclude that defendant acted with premeditation and deliberation when he fired the shot that caused the death of Glenda Love. This evidence also supports the element of intent to kill regarding the charge of assault with a deadly weapon with intent to kill inflicting serious injury.

**[6]** Defendant also argues that there was not sufficient evidence of the element of "serious injury," given Darnell's testimony that he was released from the hospital the night of the shooting and

that he only missed one day of work. The term "serious injury" includes "physical or bodily injury resulting from an assault with a deadly weapon." *State v. Joyner,* 295 N.C. 55, 65, 243 S.E.2d 367, 373-74 (1978). That a .12 gauge shotgun is a deadly weapon is beyond dispute. Whether serious injury has been inflicted is a question for the jury. *Id.* Darnell testified that he was hospitalized for gunshot wounds to the back and hip, that he continued to experience pain even at the time of the trial from gunshot still lodged in his body, that he did not have the luxury of foregoing work for any length of time, and that he was limited, on first returning to work, in the tasks he could perform. This was sufficient evidence from which a jury reasonably could find that serious injury did occur. *See State v. James,* 321 N.C. 676, 688, 365 S.E.2d 579, 586 (1988) (evidence that victim was hospitalized for injuries sustained from a shooting by a .22 rifle); *State v. Hensley,* 90 N.C. App. 245, 248, 368 S.E.2d 208, 210 (1988) (factors courts have considered include, but are not limited to, pain and suffering, loss of blood, hospitalization, and time lost from work).

For the above reasons, we conclude that defendant received a fair trial free of prejudicial error.

No error.