INMAN, Judge.
 

 *711
 
 Defendant Xavier Lamar Horton ("Defendant") appeals his convictions for possession with intent to sell or deliver cocaine, possession of a stolen firearm, possession of a firearm by a felon, and attaining habitual felon status. Defendant argues that his motion to suppress evidence obtained in a traffic stop was erroneously denied, contending that the police officer who conducted the stop lacked reasonable suspicion that he was committing, or about to commit, a crime. After thorough review of the record and applicable law, we reverse the trial court's order denying the motion to suppress and vacate Defendant's convictions.
 

 *772
 

 *712
 

 I.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 

 Defendant pled guilty to all charges following the trial court's denial of his motion to suppress. The record and the evidence introduced at trial, consisting of the suppression hearing and Defendant's plea colloquy, tended to show the following:
 

 Sometime after 8:40 pm on 25 November 2016, Officer Nathan Judge ("Officer Judge") of the Graham Police Department in Alamance County received a dispatch call relaying an anonymous report concerning a "suspicious white male," with a "gold or silver vehicle" in the parking lot, walking around a closed business, Graham Feed & Seed.
 
 [1]
 
 Officer Judge knew that another business across the street experienced a break-in in the past and that there were previous residential break-ins and vandalism in the area.
 
 [2]
 

 When Officer Judge arrived at Graham Feed & Seed, he discovered a silver Nissan Altima in the parking lot in front of the business. He saw no one walking in the parking lot. After parking near the southern area exit of the parking lot, Officer Judge stepped out of his patrol vehicle and walked toward the silver car "as [it] was approaching" the exit.
 
 [3]
 
 When Officer Judge was "within arm's length" of the vehicle, he shined his flashlight toward the closed window of the driver's side of the vehicle and saw Defendant, a black male, in the driver's seat. Defendant did not lower the vehicle window. Officer Judge asked Defendant, "What's up boss man?" Defendant "made no acknowledgement," but merely displayed a "blank expression on his face," and continued to exit the parking lot.
 

 Officer Judge considered Defendant's behavior to be a "little odd," and decided to follow Defendant because he "didn't know what [he] had." After catching up to Defendant's vehicle onto the main road, without "observ[ing] any bad driving, traffic violations, criminal offenses, or furtive movements," Officer Judge activated his patrol lights and siren to initiate a traffic stop.
 

 After Defendant pulled over and stopped his vehicle and lowered the driver's side window, Officer Judge approached, "immediately smelled a
 
 *713
 
 strong odor of marijuana and air fresheners," noticed a female passenger in the vehicle, and called for officer assistance. Officer Judge asked Defendant for his license and registration. Defendant admitted that he did not have his license and provided his name and date of birth. The front seat passenger stated that the vehicle was registered in her name.
 
 [4]
 

 After Officer Judge began searching the vehicle, Defendant admitted marijuana would be found in the center console. Officer Judge found marijuana in the console. He also found several plastic baggies containing a "white powder[y] substance" and large amounts of cash in an open purse on the front passenger floorboard, additional baggies with white powdery substance and the top of a scale with white powder residue in the center console, and a stolen black Sig Sauer 9 millimeter firearm in the glove compartment. Officer Judge then arrested Defendant and took him to the police station. Defendant eventually admitted possessing the firearm and admitted that the cash found in the vehicle-totaling $1,292-came from drug sales.
 

 On 31 July 2017, Defendant was indicted for possession of a stolen firearm, possession of a firearm by a felon, possession with intent to sell or deliver cocaine, possession of less than one-half ounce of marijuana, maintaining a vehicle used to keep and sell cocaine and marijuana, and attaining habitual felon status. On 15 March 2018, Defendant filed a motion to suppress evidence seized as a result of the stop. The motion came on for hearing on 19 March 2018 and Officer Judge was the only testifying witness. After the parties concluded their arguments, the trial court orally denied Defendant's motion, concluding
 
 *773
 
 that Officer Judge had formed a reasonable articulable suspicion to justify stopping Defendant. The trial court entered this ruling in a written order on 10 April 2018.
 

 After the trial court denied his motion to suppress, Defendant pled guilty to all charges except those for maintaining a vehicle to keep and sell cocaine and marijuana and possession of less than one-half ounce of marijuana, which were dismissed pursuant to a plea agreement. The trial court consolidated the cocaine and firearms charges into one judgment and sentenced Defendant to the presumptive range of 77 to 105 months' imprisonment, with credit given for 1 day spent in confinement; and ordered him to pay a total of $1,627.50 in restitution and court costs. Defendant filed written notice of appeal on 23 April 2018.
 
 [5]
 

 *714
 

 II.
 
 ANALYSIS
 

 A. Jurisdiction
 

 As a preliminary matter, we address whether this Court has jurisdiction to hear Defendant's appeal from the superior court's order denying his motion to suppress.
 

 Upon a guilty plea, a defendant has the right to appeal an order denying a motion to suppress evidence so long as it is "an appeal from a judgment of conviction." N.C. Gen. Stat. § 15A-979(b) (2017). If the defendant merely appeals the denial of his motion, rather than the final judgment, this Court lacks jurisdiction over the appeal.
 
 See
 

 State v. Miller
 
 ,
 
 205 N.C. App. 724
 
 , 725,
 
 696 S.E.2d 542
 
 , 543 (2010) ("Although Defendant preserved his right to appeal by filing his written notice of intent to appeal from the denial of his motion to suppress, he failed to appeal from his final judgment, as required by [ Section] 15A-979(b).").
 

 Here, though Defendant timely filed written notice of appeal, the notice, much like in
 
 Miller
 
 , attempts to appeal the trial court's "Order denying his Motion to Suppress Evidence" instead of the judgment underlying his convictions. We thus conclude that Defendant's notice was deficient and he failed to properly preserve his right to appeal.
 

 Nonetheless, we have "the option 'to exercise our discretion to treat [D]efendant's appeal as a petition for certiorari' in order to reach the merits" of his argument.
 
 State v. McNeil
 
 , --- N.C. App. ----, ----,
 
 822 S.E.2d 317
 
 , 321 (2018) (quoting
 
 State v. Phillips
 
 ,
 
 149 N.C. App. 310
 
 , 314,
 
 560 S.E.2d 852
 
 , 855 (2002) ) (alterations in original). Therefore, pursuant to N.C. Gen. Stat. § 7A-32(c), we will "treat [D]efendant's appeal as a petition for certiorari and grant the writ to address the merits of this appeal."
 
 Phillips
 
 ,
 
 149 N.C. App. at 314
 
 ,
 
 560 S.E.2d at 855
 
 .
 

 B. Reasonable Suspicion for the Traffic Stop
 

 The sole issue on appeal is whether the trial court erred in denying Defendant's motion to suppress evidence resulting from the traffic stop. In reviewing the denial of a defendant's motion to suppress, we "determine whether there was competent evidence to support the trial court's underlying findings of fact" and "whether the findings of fact support the trial court's ultimate conclusions of law."
 
 State v. Fleming
 
 ,
 
 106 N.C. App. 165
 
 , 168,
 
 415 S.E.2d 782
 
 , 784 (1992). We review the trial
 
 *715
 
 court's conclusions of law
 
 de novo
 
 , "consider[ing] the matter anew and freely substitut[ing] [our] own judgment for that of the trial court."
 
 State v. Knudsen
 
 ,
 
 229 N.C. App. 271
 
 , 281,
 
 747 S.E.2d 641
 
 , 649 (2013).
 

 Generally, "the United States and North Carolina Constitutions protect an individual against unreasonable searches and seizures."
 
 State v. Otto
 
 ,
 
 366 N.C. 134
 
 , 136,
 
 726 S.E.2d 824
 
 , 827 (2012) (citing U.S. Const. amend. IV ; N.C. Const. art. I, § 20 ). In analyzing what constitutes a "reasonable seizure," the United States Supreme Court has consistently held that "a police officer may effect a brief investigatory seizure of an individual where the officer has reasonable, articulable suspicion that a crime may be underway."
 

 *774
 

 State v. Barnard
 
 ,
 
 184 N.C. App. 25
 
 , 29,
 
 645 S.E.2d 780
 
 , 783 (2007) (citing
 
 Terry v. Ohio
 
 ,
 
 392 U.S. 1
 
 , 21,
 
 88 S.Ct. 1868
 
 , 1880,
 
 20 L.Ed.2d 889
 
 , 906 (1968) ). Traffic stops are considered seizures " 'even though the purpose of the stop is limited and the resulting detention quite brief.' "
 
 State v. Murray
 
 ,
 
 192 N.C. App. 684
 
 , 687,
 
 666 S.E.2d 205
 
 , 207 (2008) (quoting
 
 Delaware v. Prouse
 
 ,
 
 440 U.S. 648
 
 , 653,
 
 99 S.Ct. 1391
 
 , 1393,
 
 59 L.Ed.2d 660
 
 , 667 (1979) ).
 

 Reasonable suspicion is "based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training."
 
 [6]
 

 State v. Watkins
 
 ,
 
 337 N.C. 437
 
 , 441,
 
 446 S.E.2d 67
 
 , 70 (1994). "A court must consider the totality of the circumstances-the whole picture-in determining whether a reasonable suspicion to make an investigatory stop exist[ed]."
 
 State v. Campbell
 
 ,
 
 359 N.C. 644
 
 , 664,
 
 617 S.E.2d 1
 
 , 14 (2005) (quotations and citation omitted). While reasonable suspicion is easier than proving probable cause, "and requires a showing considerably less than preponderance of the evidence,"
 
 State v. Barnard
 
 ,
 
 362 N.C. 244
 
 , 247,
 
 658 S.E.2d 643
 
 , 645 (2008) (citation and quotation marks omitted), there must be enough suspicion "to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field."
 
 Brown v. Texas
 
 ,
 
 443 U.S. 47
 
 , 51,
 
 99 S.Ct. 2637
 
 , 2640,
 
 61 L.Ed.2d 357
 
 , 362 (1979).
 

 Because Defendant does not challenge the trial court's findings of fact, they "are deemed to be supported by competent evidence and are binding on appeal."
 

 *716
 

 State v. Roberson
 
 ,
 
 163 N.C. App. 129
 
 , 132,
 
 592 S.E.2d 733
 
 , 735-36 (2004). We need only determine whether the trial court's findings support its conclusion of law that Officer Judge had reasonable suspicion to stop Defendant.
 

 The trial court made the following relevant findings of fact:
 

 1. On or about November 25, 2016, Officer Nathan Judge with the Graham Police Department received a call from Communications that a tip came in of a suspicious white male walking around the business of Graham Feed & Seed ...;
 

 2. That the tip also included a suspicious gold or silver vehicle in the parking lot of the business;
 

 3. That there was no description of what the suspicious activity was and no timeframe as to how long the caller observed this suspicious activity;
 

 4. That the tip came in around 8:40 p.m. at night;
 

 5. That before Officer Judge arrived to the business, he was familiar with the area and knew that there had been residential break-ins in the area, the business across the street had been broken into, and there had been vandalism in the area;
 

 6. That the officer did not testify to a specific time frame when the previous break-ins had occurred;
 

 7. That when Officer Judge arrived, he saw a silver car in the parking lot in front of the business;
 

 8. That the business was closed and there were no other cars in the parking lot;
 

 9. That Officer Judge did not see anyone walking around the business and did not see anyone outside of the vehicle;
 

 10. That the business does not a have a "no trespassing" sign on its premises;
 

 11. That Officer Judge pulled his vehicle onto the southern part of the parking lot of the Graham Feed & Seed, exited his patrol car, retrieved his flashlight and approached the silver car as the silver car was approaching the roadway, near the exit of the parking lot;
 

 12. That Officer Judge approached the silver car, shone [sic] a flashlight into the face of the driver, and said "What's up boss man"?;
 

 *775
 

 *717
 
 13. That the windows on the silver car were closed;
 

 14. That Officer Judge could not see inside the silver car except when he shined his flashlight into the face of the driver;
 

 15. That the driver made no acknowledgment of the officer, and left the parking lot of the business;
 

 16. That Officer Judge acknowledged that [Defendant] was not required to stop when the officer approached [D]efendant's vehicle;
 

 17. That Officer Judge was within arm's length of the silver vehicle at this time;
 

 18. That Defendant is a black male;
 

 19. That Officer Judge then followed the silver vehicle because he didn't know what he had;
 

 20. That Officer Judge knew that other officers park their patrol cars in the gravel parking lot after hours for various reasons;
 

 21. That Officer Judge did not know if this vehicle was in the process of turning around in the parking lot;
 

 22. That between the time of following the silver vehicle and before effectuating the stop, Officer Judge did not observe any bad driving, traffic violations, criminal offenses, or furtive movements;
 

 23. That Defendant stopped appropriately when Officer Judge activated his blue lights.
 

 We hold that Officer Judge's justification for conducting the traffic stop of Defendant was nothing more than an "inchoate and unparticularized suspicion or 'hunch.' "
 
 United States v. Sokolow
 
 ,
 
 490 U.S. 1
 
 , 7,
 
 109 S.Ct. 1581
 
 , 1585,
 
 104 L.Ed.2d 1
 
 , 7 (1989) (quotation and citations omitted).
 

 "Where the justification for a warrantless stop is information provided by an anonymous informant, a reviewing court must assess whether the tip at issue possessed sufficient indicia of reliability to support the police intrusion on a detainee's constitutional rights."
 
 State v. Johnson
 
 ,
 
 204 N.C. App. 259
 
 , 263,
 
 693 S.E.2d 711
 
 , 715 (2010) (citing
 
 Illinois v. Gates
 
 ,
 
 462 U.S. 213
 
 ,
 
 103 S.Ct. 2317
 
 ,
 
 76 L.Ed.2d 527
 
 (1983) ). Indices of reliability can come in two forms: (1) the tip itself provides enough detail and information to establish reasonable suspicion, or (2) though the tip lacks independent reliability, it is "buttressed by sufficient police corroboration."
 
 State v. Hughes
 
 ,
 
 353 N.C. 200
 
 , 208,
 
 539 S.E.2d 625
 
 , 630 (2000).
 

 *718
 
 Absent corroboration, an anonymous tip rarely supports reasonable suspicion because, "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if [the] allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity."
 
 Florida v. J.L.
 
 ,
 
 529 U.S. 266
 
 , 270,
 
 120 S.Ct. 1375
 
 , 1378,
 
 146 L.Ed.2d 254
 
 , 260 (2000) (quotations and citations omitted). As stated by our Supreme Court in
 
 Hughes
 
 :
 

 [A]n accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.
 

 Hughes
 
 ,
 
 353 N.C. at 209
 
 ,
 
 539 S.E.2d at 632
 
 (quoting
 
 J.L.
 
 ,
 
 529 U.S. at 272
 
 ,
 
 120 S.Ct. at 1379
 
 ,
 
 146 L.Ed.2d at
 
 261 ). Consequently:
 

 The type of detail provided in the [anonymous] tip and corroborated by the officers is critical in determining whether the tip can supply the reasonable suspicion necessary for the stop. Where the detail contained in the tip merely concerns identifying characteristics, an officer's confirmation of these details will not legitimize the tip.
 

 Johnson
 
 ,
 
 204 N.C. App. at 264
 
 ,
 
 693 S.E.2d at 715
 
 .
 

 In
 
 Hughes
 
 , police officers received an anonymous tip that a person named "Markie" would be arriving in Jacksonville from New York City by bus around 5:30 pm, possessing marijuana and cocaine.
 
 353 N.C. at 201
 
 ,
 
 539 S.E.2d at 627
 
 . The tip described Markie as a "dark-skinned Jamaican from New York who weighs over three hundred pounds," about "six foot, one inch tall or taller," about 20-30 years old, and would be "clean cut with a
 
 *776
 
 short haircut and wearing baggy pants."
 
 Id.
 
 at 201-02,
 
 539 S.E.2d at 627
 
 . The informant stated that Markie "sometimes" travelled to Jacksonville on weekends before it got dark, "sometimes" took a taxi from the bus station, "sometimes" had an overnight bag, and "would be headed to North Topsail Beach."
 
 Id.
 
 at 202,
 
 539 S.E.2d at 627
 
 . When the officers reached the bus station, they saw a bus from Rocky Mount, rather than New York City, arrive around 3:50 pm.
 

 Id.
 

 The officers saw the defendant, who "matched the exact description [they] had been given and was carrying an overnight bag," not exiting the bus but entering a taxi. The taxi traveled toward a highway intersection where, depending
 
 *719
 
 on which way the taxi turned, would lead to either Wilmington or Topsail Beach.
 
 Id.
 
 at 202,
 
 539 S.E.2d at 628
 
 . The officers stopped the taxi before it reached the intersection.
 

 Id.
 

 The
 
 Hughes
 
 court concluded that, "[w]ithout more, these details [were] insufficient corroboration because they could apply to many individuals," as the information was "peppered with uncertainties and generalities."
 
 Id.
 
 at 209,
 
 539 S.E.2d at 632
 
 .
 

 In
 
 Johnson
 
 , officers received an anonymous tip that a "black male wearing a white t-shirt and blue shorts was selling illegal narcotics and guns" out of a blue Mitsubishi on a street corner in a local housing community.
 
 204 N.C. App. at 260-61
 
 ,
 
 693 S.E.2d at 713
 
 . The tipster provided a vehicle license plate number, WT 3456, but did not provide a name of the suspect.
 

 Id.
 

 Before the officers arrived at the described location, the tipster called back and informed the officers that the suspect left the area, "but would return shortly."
 
 Id.
 
 at 261,
 
 693 S.E.2d at 713
 
 . The officers then stationed themselves near one of the only two entryways into the neighborhood and waited.
 

 Id.
 

 Soon thereafter, the officers saw a blue Mitsubishi, with license plate number WTH 3453, being driven by a black male wearing a white T-shirt.
 

 Id.
 

 Through a plate check, the officers discovered that it was registered to a black male whose driver's license had been suspended.
 

 Id.
 

 An officer stopped the defendant about "100 yards from the original area mentioned in the tip."
 
 Id.
 
 at 261,
 
 693 S.E.2d at 714
 
 . We held that the stop was not based on reasonable suspicion because the tip "offered few details of the alleged crime, no information regarding the informant's basis of knowledge, and scant information to predict the future behavior of the alleged perpetrator."
 
 Id.
 
 at 263,
 
 693 S.E.2d at 714-15
 
 . Thus, because of "the failure of the officers to corroborate the tip's allegations," it lacked sufficient indicia of reliability to justify the stop.
 
 Id.
 
 at 263,
 
 693 S.E.2d at 715
 
 .
 

 The anonymous tip that led Officer Judge to stop Defendant reported no crime and was only partially correct. Although there was in fact a silver car in the business' parking lot around 8:40 pm, the tip also said it could have been gold and there was no white male in the parking lot or in the vehicle. Additionally, not only did the tip provide substantially less detail than the tips in
 
 Hughes
 
 and
 
 Johnson
 
 , it merely described the individual as "suspicious" without any indication as to why, and no information existed as to who the tipster was and what made the tipster reliable. Like in
 
 Hughes
 
 and
 
 Johnson
 
 , "there [is] nothing inherent in the tip itself to allow a court to deem it reliable and to provide [Officer Judge] with the reasonable suspicion necessary to effectuate a stop."
 
 Johnson
 
 ,
 
 204 N.C. App. at 264-65
 
 ,
 
 693 S.E.2d at 716
 
 .
 

 *720
 
 The vague tip that led Officer Judge to stop Defendant and the other circumstances in this case are similar to those this Court has previously held were insufficient to support reasonable suspicion for a traffic stop.
 
 Murray
 
 ,
 
 192 N.C. App. at 684
 
 ,
 
 666 S.E.2d at
 
 205 ;
 
 State v. Chlopek
 
 ,
 
 209 N.C. App. 358
 
 ,
 
 704 S.E.2d 563
 
 (2011).
 
 Murray
 
 arose from the following facts: At around 3:40 am, an officer was performing a property check of an industrial park "as part of a 'problem oriented policing project' ... following reports of break-ins of vehicles and businesses."
 
 192 N.C. App. at 684
 
 ,
 
 666 S.E.2d at 206
 
 . When the officer rounded one of the buildings, he saw the defendant's car leave an area the officer had already checked.
 
 Id.
 
 at 684-85,
 
 666 S.E.2d at 206
 
 . The officer followed the vehicle and made a traffic stop without observing any illegal activity or traffic violation.
 
 Id.
 
 at 685,
 
 666 S.E.2d at 206
 
 . Similarly in
 
 Chlopek
 
 , at 12:05 am, officers were in a partially-developed subdivision conducting a separate traffic stop when they noticed the
 
 *777
 
 defendant's vehicle heading from the subdivision entrance in the direction of undeveloped lots.
 
 209 N.C. App. at 358-59
 
 ,
 
 704 S.E.2d at 564
 
 . One of the officers thought that the defendant "seemed a little nervous in his manner [in] observing" the officers.
 
 Id.
 
 at 359,
 
 704 S.E.2d at 564
 
 . Prior to the unrelated stop, the officers "had been put on notice that there had been a large number of copper thefts from" undeveloped portions of other subdivisions, but had received no such reports for that subdivision.
 

 Id.
 

 When the defendant's vehicle returned to the subdivision entrance, the officers stopped the defendant's car.
 

 Id.
 

 In both
 
 Murray
 
 and
 
 Chlopek
 
 , we held that officers lacked reasonable suspicion to stop defendants because the majority, if not all, of the trial court's findings related to the mere generalized description of the area.
 
 See
 

 Murray
 
 ,
 
 192 N.C. App. at 689
 
 ,
 
 666 S.E.2d at 208
 
 ("Officer Arthur never articulated any specific facts about the vehicle itself ...; instead, all of the facts relied on by the trial court ... were general to the area ... and would justify the stop of
 
 any
 
 vehicle there." (emphasis in original) );
 
 Chlopek
 
 ,
 
 209 N.C. App. at 363
 
 ,
 
 704 S.E.2d at 567
 
 ("[A]s in
 
 Murray
 
 , the facts relied upon by the trial court in concluding that reasonable suspicion existed were general to the area[.]").
 

 Here, much like in
 
 Murray
 
 and
 
 Chlopek
 
 , the trial court's findings of fact concerning Officer Judge's knowledge about criminal activity refer to the area in general and refer to no particularized facts. Officer Judge did not articulate how he was "familiar with the area," how he "knew that there had been residential break-ins," or how much "vandalism" and other crimes had been occurring. The findings also stipulated that there was no "specific time frame [given for] when the previous break-ins had occurred."
 

 *721
 
 Nor can we agree with the State's argument that Officer Judge either corroborated the tip or formed reasonable suspicion of his own accord when he arrived at the parking lot. The State points to factors noted in the trial court's findings that have historically been cited in the totality of the circumstances analysis to support establishment of reasonable suspicion.
 
 See
 

 Illinois v. Wardlow
 
 ,
 
 528 U.S. 119
 
 , 124,
 
 120 S.Ct. 673
 
 , 676,
 
 145 L.Ed.2d 570
 
 , 576 (2000) (high-crime area);
 
 State v. Fields
 
 ,
 
 195 N.C. App. 740
 
 , 744,
 
 673 S.E.2d 765
 
 , 768 (2009) (unusual hour of the day);
 
 Watkins
 
 ,
 
 337 N.C. at 443
 
 ,
 
 446 S.E.2d at 71
 
 (businesses in vicinity were closed). Although these factors, in other contexts, can help establish reasonable suspicion, they are insufficient given the other circumstances in this case.
 

 The State asserts that Defendant's "nervous conduct" and "unprovoked flight" supported Officer Judge's reasonable suspicion. But the trial court did not make either of those findings, and it is not within the authority of this Court to do so. In resolving a motion to suppress, the trial court "is entrusted with the duty to hear testimony, weigh and resolve any conflicts in the evidence, find the facts, and, then based upon those findings, render a legal decision."
 
 State v. Cooke
 
 ,
 
 306 N.C. 132
 
 , 134,
 
 291 S.E.2d 618
 
 , 620 (1982). We consider only the "cold, written record" before us.
 
 Id.
 
 at 135,
 
 291 S.E.2d at 620
 
 (quoting
 
 State v. Smith
 
 ,
 
 278 N.C. 36
 
 , 41,
 
 178 S.E.2d 597
 
 , 601 (1971) ). The trial court's findings speak nothing of Defendant's demeanor-other than his lack of acknowledgement of Officer Judge-or the manner in which Defendant drove and exited the parking lot. The State's argument in this respect is unconvincing.
 

 The State also relies on prior decisions for the general proposition that reasonable suspicion can be based on a suspect's suspicious activities in an area known for criminal activity at an unusual hour. In
 
 State v. Blackstock
 
 , officers were patrolling in an unmarked vehicle as part of a "Crime Abatement Team" in an area where "statistical data indicated [the] area had a problem with robberies and break-in enterings."
 
 165 N.C. App. 50
 
 , 53,
 
 598 S.E.2d 412
 
 , 414 (2004). Around 11:45 pm, the officers found two men walking along the front of closed businesses in a strip mall.
 

 Id.
 

 The men walked very slowly and kept looking in and out of the businesses' windows.
 
 Id.
 
 at 53,
 
 598 S.E.2d at 415
 
 . When a clearly marked police cruiser arrived at the scene, the two men "immediately turned around" and "immediately began to walk hurriedly backward."
 

 Id.
 

 The two men eventually entered
 
 *778
 
 a vehicle which was concealed from public view along the perimeter of the strip mall.
 

 Id.
 

 As the officers followed the two men, the vehicle drove slowly through a gas station and a fast-food restaurant parking lot without stopping, while the man in the passenger seat kept looking back at the officers following them.
 

 Id.
 

 *722
 
 We concluded, based on a litany of factors including that the strip mall had been "targeted by law enforcement officers as a high crime area," the officers had reasonable suspicion to stop the two men.
 
 Id.
 
 at 59,
 
 598 S.E.2d at 418
 
 .
 

 In
 
 State v. Butler
 
 , a detective saw the defendant "in the midst of a group of people congregated on a corner known as a 'drug hole,' " where the detective had been conducting "daily surveillance for several months."
 
 331 N.C. 227
 
 , 233,
 
 415 S.E.2d 719
 
 , 722 (1992). The detective had made four to six drug-related arrests on the same corner in the previous six months.
 

 Id.
 

 After the detective and the defendant made eye contact, the defendant "immediately moved away," which the detective construed to indicate flight.
 

 Id.
 

 The detective then stopped the defendant and asked him for his identification. Our Supreme Court concluded that the criminal activity in the area, taken together with the detective's experience and observation of the defendant's reaction to police presence, rendered the stop constitutional.
 
 Id.
 
 at 232, 415 S.E.2d at 721.
 

 In
 
 State v. Fox
 
 , at about 12:50 am, an officer observed the defendant's vehicle travelling down a dead-end street "where several padlocked businesses were located."
 
 58 N.C. App. 692
 
 , 692,
 
 294 S.E.2d 410
 
 , 411 (1982). The officer knew several break-ins had occurred in the area and had taken a report of a break-in from one of the businesses that evening.
 

 Id.
 

 The officer watched the vehicle stop and turn around, and, when the vehicle was passing the officer's patrol car, the defendant "cocked" his head away.
 

 Id.
 

 The officer stopped the defendant's vehicle absent any observed traffic violations. We held that the officer had reasonable suspicion for the stop.
 
 Id.
 
 at 695,
 
 294 S.E.2d at 413
 
 .
 

 In
 
 State v. Tillett
 
 , at approximately 9:40 pm, an officer was patrolling alone in a " 'heavily wooded' area containing summer cottages," with only one of which being occupied at the time.
 
 50 N.C. App. 520
 
 , 521,
 
 274 S.E.2d 361
 
 , 362 (1981). The officer was aware of frequents reports of "firelighting" deer at that time of year.
 

 Id.
 

 That night, it was raining and the officer was driving down a narrow, one-way dirt road that made it difficult for two vehicles to pass each other.
 

 Id.
 

 The officer spotted a car carrying the defendant and a passenger and "did not observe an inspection sticker on the vehicle."
 

 Id.
 

 The officer did not stop the defendant's car, as it was "his intention [ ] to allow the vehicle to go to the [lone] occupied dwelling" in the area.
 

 Id.
 

 After the officer continued on for about "fix or six miles," he spotted the defendant's car coming out of the wooded area. The officer then stopped his patrol vehicle in front of the car and put his lights on.
 
 Id.
 
 at 521-22,
 
 274 S.E.2d at 362
 
 . We concluded
 
 *723
 
 that, based on the facts found by the trial court, the officer would not have been unreasonable in thinking that the defendant and his passenger were "firelighting" deer or burglarizing the unoccupied homes.
 
 Id.
 
 at 524,
 
 274 S.E.2d at 364
 
 .
 

 Unlike the facts in
 
 Blackstock
 
 ,
 
 Butler
 
 ,
 
 Fox
 
 , and
 
 Tillett
 

 -
 
 where the officers were already in areas because they were
 
 specifically
 
 known and had detailed instances of criminal activity-Officer Judge arrived at the parking lot because of a vague tip about an undescribed white male engaged in undescribed suspicious activity in a generalized area known for "residential break-ins" and "vandalism."
 

 The trial court made no findings as to what suspicious activity by Defendant warranted Officer Judge's suspicion. The trial court found that when Officer Judge approached Defendant's car and called out to him, Defendant made "no acknowledgement." Officer Judge admitted at trial that "[D]efendant was not required to stop" when he approached him. While it might seem socially peculiar-possibly uncouth-that someone, like Defendant here, would ignore a police officer's confrontation, such an attempt by Officer Judge at a "consensual encounter" provided Defendant the "liberty 'to disregard [Officer Judge] and go about his business.' "
 
 State v. Sinclair
 
 ,
 
 191 N.C. App. 485
 
 , 489,
 
 663 S.E.2d 866
 
 , 870 (2008) (quoting
 
 *779
 

 Florida v. Bostick
 
 ,
 
 501 U.S. 429
 
 , 434,
 
 111 S.Ct. 2382
 
 , 2386,
 
 115 L.Ed.2d 389
 
 , 398 (1991) ).
 

 Accordingly, we are unpersuaded by the State's argument and agree with Defendant that the trial court erred in concluding that Officer Judge had reasonable suspicion to stop him. Though the tip did bring Officer Judge to the Graham Feed & Seed parking lot, where he indeed found a silver car in front of the then-closed business with no one else in its vicinity at 8:40 pm, and although Defendant did not stop for or acknowledge Officer Judge, we do not believe these circumstances, taken in their totality, were sufficient to support reasonable suspicion necessary to allow a lawful traffic stop. When coupled with the facts that (1) Defendant was in a parking lot that did "not have a 'no trespassing' sign on its premises"-making it lawful for Defendant to be there; (2) Defendant was not a white male as described in the tip; (3) Defendant's car was possibly in motion when Officer Judge arrived in the parking lot; (4) Defendant had the constitutional freedom to avoid Officer Judge; and (5) Defendant did not commit any traffic violations or act irrationally prior to getting stopped, there exists insufficient findings that Defendant was committing, or about to commit, any criminal activity.
 

 *724
 
 Concluding otherwise would give undue weight to, not only vague anonymous tips, but broad, simplistic descriptions of areas absent specific and articulable detail surrounding a suspect's actions.
 

 REVERSED AND VACATED.
 

 Judges DILLON and COLLINS concur.
 

 [1]
 

 No evidence was introduced for when Officer Judge received the call or when he arrived at the business' parking lot.
 

 [2]
 

 No evidence was introduced as to when these alleged crimes occurred.
 

 [3]
 

 The trial court's findings of fact are unclear as to whether the vehicle was already in motion on or before Officer Judge's arrival.
 

 [4]
 

 The trial court's findings of fact do not mention that there was a passenger.
 

 [5]
 

 Defendant did not give oral notice of appeal, as his counsel stipulated to the trial court that, "once the [State] and I have worked out the findings of fact, once [the trial judge] sign[s] it, then we'll give notice of appeal at that time." Defendant only reserved his right to appeal in open court, and the trial court's judgment stated as such.
 

 [6]
 

 Our Supreme Court in
 
 State v. Nicholson
 
 ,
 
 371 N.C. 284
 
 , 293,
 
 813 S.E.2d 840
 
 , 846 (2018), recently reemphasized the principle that a police officer's subjective thoughts are irrelevant when reviewing whether reasonable suspicion objectively existed. "Accordingly, we do not consider [Officer Judge's] subjective analysis of the facts as probative of whether those facts-viewed objectively-satisfy the reasonable suspicion standard necessary to support [D]efendant's seizure."
 

 Id.